**Dennis HELTON, Petitioner,**

v.

**STATE of Tennessee, Respondent.**

Supreme Court of Tennessee.

March 7, 1977.

B. C. McInturff, Kingsport, for petitioner.

David L. Raybin, Asst. Atty. Gen., R. E. Ashley, Jr., Atty. Gen., Nashville, for respondent.

## OPINION

COOPER, Chief Justice.

Petitioner, Dennis Helton, was convicted of second degree murder for the slaying of his wife, Linda Helton, and was sentenced to serve fifteen years in the penitentiary. The Court of Criminal Appeals, with one judge dissenting, affirmed the conviction. This court granted certiorari, primarily to determine if the trial judge, as the thirteenth juror, approved the verdict of the jury.

Petitioner and Linda Helton were married on three different occasions. The break-up of the first two marriages was due to Mrs. Helton's association with Jerry Lawson. After the second divorce, Mrs. Helton married Mr. Lawson. The break-up of that marriage was encouraged by petitioner. From these facts and other evidence, it is apparent that most of the turbulence in the relationship between petitioner and Linda Helton had its origin in the attention paid Mrs. Helton by Jerry Lawson.

Mrs. Helton was killed on July 26, 1974, by a shot from a pistol fired by petitioner. Ironically, the killing occurred on the day the Heltons had planned to take their family to Nashville on a "third" honeymoon.

Petitioner's version of events leading up to the shooting and the shooting itself, is set forth in the following statement given the arresting officers:

"I got off work at the Dodge plant at 11:30 today. I started home and saw my truck at East Gate Shopping Center. I stopped and went in Super Dollar and Dollar General and Lays 5 & 10 store looking for my wife. I didn't find my wife so I went on home. About 2:30 P.M. I called Marge Lamb and she said Linda had brought the kids up their about 8:00 A.M. so she could go to the doctor. About 2:45 P.M. I started back to town to see if I could find my wife. I met my wife coming out of Striggersville. She was following her ex-husband Jerry Lawson. My wife and I have been married three times. Both divorces and separations one time after another was because of him, Jerry Lawson. I turned around and followed my wife. I pulled around her and she pulled in behind me. I went back to the truck and opened the door. I asked Linda where she had been. Linda said she had been to the doctor. Then I asked her if she had been with Jerry. Linda said no. I knowed you would blame me with it when you seed us together. I then slapped her in the face. Linda then slapped me in the face and said I'll kill you and jerked the truck door closed. Linda went home and I followed her. Instead of stopping in the driveway, Linda pulled the truck all the way to the front door and ran inside the trailer. I followed Linda in the trailer, when I went through the front door, Linda was just stepping off the chair at the sink. Linda was getting the gun out of the holster. The gun was a .38 and was always kept loaded on top of the cabinets over the sink. I grabbed Linda and we wrestled over the gun. I got the gun away from her. When Linda saw I had

the gun she turned to run into the living room. The next thing I knew, the gun went off. I ran and grabbed her. I didn't think she was hit until I saw the blood on my hand. Linda said she was sorry and I said you was with him and she shook her head yes. I had laid her in the floor and called the Rescue Squad. I stayed with Linda until the Rescue Squad came."

In addition to the statement, the State's proof showed that Mrs. Helton was found in the front room of the trailer, with one bullet hole in her back. A dish towel was wrapped several times around her right hand in a manner to make it difficult, if not impossible, for her to have held a gun. There was a bullet hole in the door separating the kitchen of the trailer from the living room, indicating that the fatal shot was fired when Mr. Helton was in the kitchen and his wife in the front room. The pistol used in the killing was found to have one spent shell and two live shells in it.

In overruling petitioner's motion for a new trial, which was filed in an effort to set aside the jury's verdict of guilty of second degree murder, the trial judge stated:

"Before the trial of this case, I was familiar with all the parties. That was during my private practice. I represented one of them in some trouble that was had. There is only one thing, of course, that worries me, and that is, that *if the jury returns a verdict of guilty and there is evidence to sustain it I feel that I am almost bound to overrule the motion for a new trial. If I had been on the jury, I would have returned a conviction of voluntary manslaughter.* [Emphasis supplied].

"While I know in the charge of murder in the first degree and involuntary manslaughter as well as murder in the second degree any talk about sudden heat of passion, I can understand how the defendant was upset. As I say, I was familiar with the situation before it happened. If I had the jurisdiction to do so, I think I would reduce it but I feel I do

not have that jurisdiction. I feel really that the verdict was somewhat harsh. "I know that the defendant loved his wife. I know that from previous experience in the trial between these parties. I know the difficulty that he encountered at other times. I know the animosity of the family of the wife toward the deceased, but in spite of that I feel that there is evidence to sustain the verdict of the jury, and it is necessary on that basis that I deny a motion for a new trial."

In announcing the verdict and sentencing the defendant the trial judge made this additional statement:

"You, I am sure, want to appeal the ruling of the Court, and I might state to the court reporter that I would like for the remarks that I made to go into the record, and I will state further to the defendant and to the attorneys for the defendant if the Court of Criminal Appeals does affirm the judgment of the Court and the verdict of the jury, after he has served a certain length of time if there is anything that I can do to reduce it, I'll do it."

■ The remarks of the trial judge set out above indicate to us that he was not satisfied with the jury's verdict. Specifically, the trial judge expressed dissatisfaction with the degree of homicide of which petitioner was convicted. Despite this dissatisfaction, the trial judge overruled the motion for new trial. This was error which requires that petitioner be given a new trial.

■ It is settled in this state that in all instances where there is a trial by jury, the trial judge is under the burden of acting as the thirteenth juror to either approve or disapprove the verdict of the jury. *White v. State*, 490 S.W.2d 502 (Tenn.1973); *Messer v. State*, 215 Tenn. 248, 385 S.W.2d 98 (1964); *Hime v. Sullivan*, 188 Tenn. 605, 221 S.W.2d 893 (1949); *Mize v. Skeen*, 63 Tenn. App. 37, 468 S.W.2d 733 (1971). *See also Curran v. State*, 157 Tenn. 7, 4 S.W.2d 957 (1928), wherein this court quotes with approval the following statement of Mr. Jus-

tice McKinney in *Durant v. State*, Manuscript Opinion, filed May 2, 1925:

"[U]nder our system, (a) the trial court exercises the function of a thirteenth juror; (b) that he must weigh the evidence, pass upon the issues, and decide whether they are supported by the evidence; (c) where he fails to do this the case will be reversed and remanded for a new trial; and (d) 'that he must be satisfied, as well as the jury' (meaning, in a criminal case, satisfied that the defendant is guilty)."

In *State v. Ferguson*, 165 Tenn. 61, 64, 52 S.W.2d 140, 141 (1932), this court stated: " * * * Under our practice, if the trial court is of the opinion that the verdict is not sustained by the evidence, all that he can do is to grant a new trial."

And in *Messer v. State, supra*, this court granted a new trial where the trial judge expressly indicated that he did not approve the degree of homicide of which the defendant was convicted.

█ Petitioner also has complained of the fact that the trial judge, in instructing the jury, characterized the statement he made to the investigating officers as a confession. Petitioner insists that it was no more than an admission against interest and should have been so characterized. The distinction between an admission and a confession is blurred. Generally, however, "a 'confession' is a statement by the accused that he engaged in conduct which constitutes a crime. . . . An admission is an acknowledgement by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgement of guilt itself. An admission, then, is something less than a confession and, unlike a confession, putting to one side the problem of corroboration, an admission is not sufficient in itself to support a conviction." 3 Wharton's Criminal Evidence (13th ed. Torcia 1973), §§ 662 and 663. *See also Collins v. State*, 169 Tenn. 393, 88 S.W.2d 452 (1936).

Here, the petitioner admitted shooting his wife, but not his guilt to the offense with which he was charged, nor for that matter any offense. To the contrary, petitioner asserted the defenses of self-defense and accidental shooting, both of which are compatible with his statement if the statement is taken at face value. The statement properly then should be characterized as an admission and, on remand, the jury should not be instructed on "confession" and its effect.

The judgment of the trial court is reversed and the case is remanded for a new trial.

FONES, HENRY, BROCK and HARBISON, JJ., concur.