IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2004

## STATE OF TENNESSEE v. LARRY F. LITTON

**Appeal from the Criminal Court for Sullivan County**
**No. S44,898    R. Jerry Beck, Judge**

---

**No. E2003-00782-CCA-R3-CD - Filed October 5, 2004**

---

The appellant, Larry F. Litton, was indicted on charges of rape in violation of Tennessee Code Annotated section 39-13-503. A jury found the appellant guilty of the lesser-included offense of sexual battery and recommended a $3,000 fine. The appellant was sentenced to a one-year sentence as a Range I Standard Offender, but the trial court ordered the appellant to serve two years on probation in lieu of incarceration. The trial court also imposed the $3,000 fine recommended by the jury. After the denial of a motion for new trial, this appeal ensued. The appellant challenges: (1) the trial court's decision to allow the testimony of Dr. Scott Levine in which he recounted a conversation with the victim that occurred several weeks after the incident; (2) the trial court's instruction to the jury that a tape-recorded conversation between the victim and the appellant was an "alleged admission;" and (3) the sufficiency of the evidence. For the following reasons, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

David E. Crockett and Lisa D. Rice, Elizabethton, Tennessee, for the appellant, Larry F. Litton.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; Greeley Wells, District Attorney General; and Teresa Murray Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

On Monday, October 23, 2000, the victim, Christy Trent, was admitted to Bristol Regional Medical Center for a surgical procedure. The victim was licensed as a nurse, but did not work at the time of the procedure due to various physical ailments. The victim was scheduled to have a feeding tube installed because of a condition called "chronic aspiration." As a result of chronic aspiration when the victim swallowed food, it passed into her lungs rather than her stomach. The insertion of the feeding tube was designed to alleviate this problem.

On the day the victim was scheduled for the procedure, the appellant, a licensed registered nurse anesthetist, was working in the operating room at Bristol Regional Medical Center. The appellant introduced himself to the victim and explained that he would be responsible for both administering and monitoring her medications both prior to and during her procedure. The victim specifically asked the appellant to check on her after the procedure to make sure she was alright. The victim also complained to the appellant that her husband did not accompany her to the hospital for the procedure.

Prior to the feeding tube procedure, the victim had undergone at least thirty-three surgeries for various physical ailments. One of these surgeries required a morphine pump to be inserted into her spine for pain relief from her back problems; the morphine pump was in place at the time of the feeding tube procedure.

The victim remained in the hospital until October 27, 2000. Several days later, after calling one of her psychologists and an attorney, and having a conversation with her husband, the victim called the Bristol Tennessee Police Department to report that the appellant raped her while she was a patient at Bristol Regional Medical Center.

The appellant contacted Investigator Debbie Richmond-McCauley with the Bristol Police Department. Several days later, Investigator Richmond-McCauley spoke with the victim. According to the victim, the appellant visited her in her hospital room on Tuesday, the day after her surgery, for no apparent reason. When he left, he told her that he may come back to visit her again the next night. On Wednesday afternoon, the appellant telephoned the victim in her hospital room to tell her that he would come see her later that evening. At approximately 2:30 a.m. on Thursday morning, the appellant telephoned the victim and invited her to meet him in the "on call" room. The victim told the appellant "no" and he informed her that he would "run up" and see her. The appellant arrived at the victim's room about fifteen minutes later.

The victim claimed that once in her room, the appellant crossed the room to the windows and drew the shades tighter. The victim claimed that the appellant then sat on her bed and spoke with

-2-

her briefly. After some light conversation, the victim claimed that the appellant leaned over the rail of her bed and started kissing her on the mouth and "stuck his tongue" in her mouth. The victim claimed that she pushed the appellant away, told him to stop, and told him that he should leave. Then, according to the victim, the appellant grabbed her right hand and said, "Look what you did," placing her hand on his erect penis over his clothing. The victim pulled her hand away and again told the appellant to leave. The victim stated that the appellant then walked around the bed, pulled down his scrub pants and exposed himself to the victim. The appellant then allegedly "leaned over and took my head again and forced his penis in my mouth." The victim claimed that she bit the appellant's penis and, as a result, he removed it from her mouth. After removing his penis from her mouth, the victim claimed that the appellant tried to get her to "masturbate him." When she refused, the victim claimed that the appellant "finished the job," ejaculating quite a bit on a pillowcase that he grabbed from a bedside table. After ejaculating, the victim claimed that the appellant went into the bathroom and cleaned himself up. When he emerged from the bathroom, the victim claimed that he acted as if nothing had happened. The appellant told the victim that he also worked some hours at Norton Hospital in a nearby Virginia town and that she could call him there. The appellant instructed her to say that she was his cousin when she called.

After hearing the victim's claims, Investigator Richmond-McCauley instructed the victim to place a call to the appellant at Norton Hospital. Investigator Richmond-McCauley provided the victim with a tape recorder to record the conversation and instructed the victim to try to get the appellant to admit to the incident during the phone call. A phone call was placed to Norton Hospital and a message was left for the appellant to return the call. Approximately two hours later, the appellant returned the call and the victim recorded the conversation. Investigator Richmond-McCauley was not present during the telephone conversation.

As a result of the victim's allegations, the Sullivan County Grand Jury indicted the appellant on charges of rape in February of 2001. A lengthy trial was held in November of 2001. During the trial, the victim maintained her version of the events and stated that she did not report the incident while still a patient at the hospital because she was "just scared" and "just clammed up."

At trial, the jury learned that the victim had a history of psychiatric problems. The victim admitted that in 1991 she faked an attempted murder in order to get sympathy from her husband. [1] During this incident, the victim shot herself and blamed it on an unidentified assailant. The victim also admitted that she was a patient at Woodridge Psychiatric Hospital in 1996 after she ingested 95 pills in an apparent suicide attempt. During this visit, the victim was diagnosed with adjustment disorder with disturbance of emotion and behavior, moderate to severe major recurrent depression and personality disorder. The victim also admitted that she again attempted suicide in 1998 and was again admitted to Woodridge after ingesting 40 pills. At that time, the victim was diagnosed with major depression, severe and recurrent psychosis, poly-substance dependent, dependent borderline traits, marital discord, and social isolation. At the time of the trial, the victim was under the

---

[1]The victim's husband at the time of the "attempted murder" later died. The victim has since remarried.

influence of several physician prescribed narcotics. On the day of her testimony, she admitted that she had taken Lortab, Soma and Lorazepam.

During her testimony, the victim also admitted that as a result of the incident at Bristol Regional Memorial Hospital, she had filed a lawsuit against the appellant and the hospital for one million dollars.

At trial, there was testimony from numerous nurses charged with the care of the victim during her stay at the hospital. Pamela Blanton, Susan Jessee and Gayla Hodge all testified that they had contact with the victim both before and after the alleged incident. All three nurses maintained that the victim never mentioned to any of them that she had been assaulted, raped, or that anything upsetting or distressing had happened to her. In fact, none of the nurses noted any difference in the victim's behavior after the alleged incident occurred. The nurses also testified that throughout her stay, the victim requested her pain medication be administered early and that she be given more pain medication than prescribed by her doctor.[2]

During the defense proof, the appellant took the stand on his own behalf. He testified that the victim's feeding tube procedure was completed without complication and that he was responsible for monitoring the victim after the procedure and administering additional medication to the victim during recovery to relieve her pain. The appellant remained with the victim in the recovery room for approximately ten minutes after the procedure was completed.

On Tuesday, October 24, the appellant claimed that he visited the victim in her room after checking her chart at the nurses station. He stated that it was normal surgical procedure to follow up with patients after their surgery. During this visit, the appellant claimed that he verified that the victim was having no problems with recovery from anesthesia. The appellant claims that the victim requested that the appellant assist her in her next surgery. According to the appellant, the victim wanted to know how she could reach him to make sure that he was in charge of her anesthesia. In response to her question, the appellant told the victim that she could call the hospital and ask for him or that she could call him at the hospital in Norton, Virginia, because he worked at that facility as well. The appellant told the victim if she could not get in touch with him to tell the person that answered the phone that she was his cousin, and she would be more likely to speak with him rather than leaving a message. The appellant told the victim that, according to her chart, no additional surgery was scheduled, but that he could check her chart at a later time to see if the date of the next surgery was set. The appellant claims that he left the room that afternoon without incident after staying for about five minutes.

On October 25, 2000, the appellant claims that he was on trauma call in the operating room of the hospital at about 7:00 p.m. After finishing with a surgery, the appellant claims that he checked

---

[2]During her hospital stay, the victim was taking a heavy schedule of narcotics for pain. The victim had what was described by several medical personnel as a strong intravenous supply of both phenergan and demerol. The victim was also given soma, ativan, prevacid, a hormone, and a drug to assist in digestion.

the victim's chart to see if more surgery was scheduled. The appellant went to the victim's room to inform her that there was still no surgery scheduled on her chart. The appellant maintains that the victim asked "whether his wife knew about them." The appellant stated that he did not know what the victim was talking about. At that point, the appellant claims that the victim asked for more drugs like the ones used during surgery. When the appellant refused to give the victim more medication, he claims that the victim grabbed him in the groin and told him that she would cry rape unless he complied. The appellant could not extricate his groin from her grip but eventually pushed the victim's arm away. When the victim grabbed the appellant's groin, he excreted some prostatic fluid onto his scrubs.[3] He went to the bathroom, wiped off the fluid with a pillowcase he found, threw the pillowcase in the bathroom floor and immediately left the room. The appellant did not report this incident to any hospital personnel and instead immediately returned to his duties in the operating room. The appellant had no further contact with the victim during her hospital stay.

The appellant also testified that he received a telephone call from the victim while he was working in Norton, Virginia. He claims that he did not understand the majority of the things that the victim was talking about, but agreed with everything she was saying because he believed she was psychotic. The appellant claimed that his medical background led him to believe that it was better to pacify the victim during the conversation rather than arguing with her.

At the conclusion of the week-long trial, the jury found the appellant not guilty of rape but guilty of the lesser-included offense of sexual battery. The trial court denied the appellant's request for judicial diversion, sentencing the appellant instead to a one-year sentence as a Range I Standard Offender, but suspended that sentence pending the appellant's completion of two years of probation. The trial court also imposed a $3,000 fine recommended by the jury.

The appellant filed a timely motion for new trial in which he argued that: (1) the finding of guilt was totally inconsistent with the proof; (2) "credible evidence presented by both the state and the defense . . . preponderates against the guilt" of the appellant; (3) the trial court erred by instructing the jury that the tape-recorded conversation between the appellant and the victim was an admission of guilt by the appellant; and (4) the trial court erred in failing to grant the appellant judicial diversion. The trial court denied the motion for new trial.

On appeal, the appellant argues that the trial court incorrectly charged the jury regarding the tape-recorded statement, incorrectly allowed Dr. Levine, the victim's doctor, to testify regarding a conversation he had with the victim several weeks after the alleged incident and that the evidence is insufficient to sustain the conviction for sexual battery.

---

[3]There was testimony from both the appellant and one of the appellant's doctors that the appellant had long suffered from prostate problems, including prostatitis. There was testimony indicating that prostatitis often causes secretions of prostatic fluid from the penis. The appellant often complained about leaking urine or prostatic fluid from his penis and even took medication for the condition.

<u>Waiver</u>

The appellant argues on appeal that the trial court erred "in allowing the testimony of Dr. Scott Levine regarding the victim's recounting of the alleged assault several weeks or months after the event." Specifically, the appellant argues that the victim did not report the event to Dr. Levine until four to eight weeks after it happened and, therefore, the trial court erred in instructing the jury that the statement made by the victim to Dr. Levine was a prior consistent statement. The State argues that the trial court correctly instructed the jury regarding the statement made by the victim to Dr. Levine.

Neither party has noticed that this issue was not raised in the motion for a new trial. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); <u>see</u> <u>also</u> <u>State v. Martin</u>, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).

In the case herein, the appellant failed to raise the issue regarding Dr. Levine's testimony in a motion for new trial. Thus, we can consider the appellant's argument only if the statements qualify as plain error under Tennessee Rule of Criminal Procedure 52(b). In exercising our discretion as to whether plain error review under Tennessee Rule of Criminal Procedure 52(b) is appropriate, the Tennessee Supreme Court has directed that we examine five factors, all of which must be present in a case in order for review under Rule 52(b) to be appropriate. These five factors are as follows: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. <u>State v. Smith</u>, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing <u>State v. Adkisson</u>, 899 S.W.2d 626, 641 (Tenn. 1994)).

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. <u>United States v. Olano</u>, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); <u>Adkisson</u>, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Tennessee Rule of Appellate Procedure 36(b), but the appellant bears the burden of persuasion with respect to plain error claims. <u>Olano</u>, 507 U.S. at 732-37.

In the case herein, we are not persuaded that the appellant has successfully carried his burden of persuasion in establishing a plain error claim. The appellant does not even acknowledge the fact that he failed to raise the issue in a motion for new trial and does not argue that the trial court's decision to admit the evidence and instruct the jury that it was a prior consistent statement was plain error. Additionally, the only authority the appellant cites for his argument is a treatise on evidence.

Further, there is no indication that a substantial right of the appellant was adversely affected, that the appellant did not waive the issue for tactical reasons, or that consideration of the error is necessary to do substantial justice. Finally, it is unclear what "clear and unequivocal rule of law" was broken. We cannot conclude that the trial court committed plain error. This issue is without merit.

### Tape Recording as "Alleged Admission"

The appellant next contends that the trial court erred in instructing the jury that the taped conversation between the victim and the appellant was an admission against interest. Specifically, the appellant argues that: (1) "[d]uring this conversation, Appellant made no admission of wrongdoing or any criminal act or activity whatsoever;" (2) the trial court erroneously characterized the appellant's statements and responses during the telephone conversation as admissions; and (3) the trial court's instruction improperly influenced the jury in their consideration of the statements and responses made during the conversation. The State argues that the trial court properly instructed the jury.

At trial, during the victim's testimony, the State introduced a tape recording of a telephone conversation between the victim and the appellant. The tape-recording was made by the victim after being instructed by the police to do so. The telephone conversation, lasting approximately twenty-five minutes, was played at least twice in its entirety during the trial, both during the testimony of the victim and the testimony of the appellant.

At the instruction of Investigator Richmond-McCauley, a telephone call was placed to the hospital in Norton, Virginia, where the appellant was working. The victim was initially unable to reach the appellant but left a message saying that she was his cousin and that he should return the phone call.[4] The appellant returned the phone call later that night after Investigator Richmond-McCauley left the victim's home. The following recitation of the telephone call is from the transcript of the tape submitted to the jury. The beginning of the conversation centered around the victim's recovery from surgery. She described to the appellant that she was "doin [sic] better" but that she had gotten a rash on her stomach after the procedure that had to be treated with medication. The appellant showed sympathy for the victim and from his comments appeared to be interested in the victim's recovery and progress. The victim then inquired about the appellant's work schedule and found out that he stayed in a hotel while working at the Norton hospital.

The victim explained that she "just wanted to talk" to the appellant because she had not talked to him "since . . you know you come [sic] up to the room the other night." She told him that she "thought . . . [he] would come up the next morning or day to say, . . . goodbye or call . . . [her]." The victim talked to the appellant about the fact that she had asked him to do the anesthesia for her next surgery. The victim then changed the subject, saying "I just don't [want] you [to] think that I

---

[4]According to both the appellant and the victim, when the victim inquired about having the appellant perform her anesthesia for a future surgery, the appellant told her that the best way to ensure that she got in touch with him was to call the hospital and leave a message that she was his cousin.

just let any man to . . . uh you know, come into the room, or . . . .  Well, I'm not easy."  The appellant responded that he did not "think that at all" and that "the thought's never entered my mind."  Then, the following exchange took place:

> [Victim]: Well uh, us, I wanted to make that very sure . . .
> [Appellant]: Yeah.
> [Victim]: . . . because I don't do this with people, I'm not, I'm not that way . . .
> [Appellant]: I know you're not.
> [Victim]: . . . and I was very uncomfortable, you know, when you put your penis in my mouth and uh . . .
> [Appellant]: Yeah.
> [Victim]: . . . and, you know, startled.
> [Appellant]: Yeah.
> [Victim]: And, cause. . . I didn't know, I didn't wanna lead you or [sic] on or think, make you to believe that I'm that type person.
> [Appellant]: Well I don't think that . . .
> [Victim]: I hope you don't, cause . . .
> [Appellant]: No honey I don't think that.
> . . . .
> [Victim]: Well, I appreciate you saying that because I, I mean it's, it's bothered me . . . .

Later on in the conversation, the following exchange occurred:

> [Victim]: So . . . do you know. . .
> [Appellant]: Yeah.
> [Victim]: And . . [sic] the, you know, well you know what went on . . [sic]
> [Appellant]: Oh yeah.
> [Victim]: I don't have to repeat it.
> [Appellant]: Yeah, yeah.
> [Victim]: And uh, but uh, I didn't [want] you to think that I'm an easy person . . . .
> [Appellant]: No, no, no . . . .
> [Victim]: . . . . that I just don't let . . .
> [Appellant]: I don't think that at all.
> [Victim]: Um, I'm not that type person that would just see a person . . uh, but you know, I saw you were so nice to me . . .
> [Appellant]: Well you're such a sweetheart yourself.
> [Victim]: Well, you, I mean, in, downstairs you started off and, I mean you were so nice, kind, and . . . .

That exchange was followed by a discussion between the victim and the appellant regarding the appellant's current work schedule, including when he would be back in Bristol, working at the hospital where the victim had her procedure, and whether the appellant would still be available to

perform the victim's anesthesia for her upcoming surgery. The appellant frequently called the victim "honey" and/or "sweetheart" throughout the conversation.

Several times during the conversation, the victim told the appellant that she did not want him to think that she was "easy." At one point, the victim commented that she did not want the appellant to think that she "just let anybody that . . . [she's] known for 3 or 4 days uh, just come in and start kissing . . . " to which the appellant merely responded, "Yeah." The victim also commented that "since my husband and I have been married, that's the first thing . . . this is the first thing, incident that's come around" and that she felt like "the rip slut of the world." The appellant mainly responded with "yeahs" and "nos" to the comments of the victim.

The victim talked briefly about the fact that her husband was out of town at a conference at the time of the phone call and told the appellant, "[P]lease, please, whatever you do, uh, you know, what happened . . . ." To which the appellant replied, "Yeah, I know, I mum's the word." The conversation then changed pace and the victim and the appellant again talked about the appellant's work schedule for the upcoming week and how the victim would go about getting in touch with him.

Two times during the conversation, the victim brought up a pillowcase:

[Victim]: And I didn't uh, I didn't know what to do uh, with, you know, the pillowcase so I just put it in a laundry bag.
[Appellant]: OK.
[Victim]: With the linen, was that . . .
[Appellant]: Yeah.
[Victim]: . . . cause I, you know, where you pitched it under the sink I didn't know . . . .
[Appellant]: Yeah.
[Victim]: I said well maybe I ought to get that up cause that doesn't look like a towel, and they might be a little suspicious on that.

. . . .

[Victim]: And, and like I say, you know, whenever at the end, when you did the thing on the pillowcase . . .
[Appellant]: Yeah, yeah.
[Victim]: . . . and took it in the bathroom and I got rid of everything.
[Appellant]: Well good.
[Victim]: I didn't . . . I think the tech would have said why is she washing with a ba. . . , with a pillowcase . . . .
[Appellant]: Oh no, no, no.
[Victim]: . . . . and pulling [sic] it under the sink.

Finally, as the conversation was coming to a close, the following exchange occurred:

[Victim]: Well, uh, talk, yeah I'll talk to you Monday, but uh, but still, you know, you know, when. . . I still feel a little uncomfortable you know, when you know, you put, you know. . .

[Appellant]: What?

[Victim]: . . . . in my mouth and I . . . .

[Appellant]: Yeah.

[Victim]: . . I, you know, makes you un. . . you know, I didn't know ya, I didn't. . .

[Appellant]: I know that.

[Victim]: . . . . and then, so . . . .

[Appellant]: I don't want you to worry about that.

[Victim]: Well, that's why I, you know, when I did that and,

[Appellant]: Well I thought . . .

[Victim]: I said stop you know I, I didn't, I'd never been put in that position.

[Appellant]: Yeah, I'm sorry.

[Victim]: You know, your penis.

[Appellant]: I know.

[Victim]: But uh, so I'm not embarrassing ya I hope.

[Appellant]: No.

[Victim]: But I just wanted to clar . . . .

[Appellant]: I just don't, I just don't want you to worry.

[Victim]: OK, well I appreciate that and . . . but I just wanted to let you know that I'm uh, I don't do this every day.

No objections were made to the introduction of the tape-recorded conversation. When the appellant took the stand to testify, he explained the conversation with the victim as follows:

I had ascertained by what happened in the room that I was dealing with someone that had some serious psychological problems and especially when she started saying, "Does your wife know about us?" And I - - - - she started talking pretty bizarre and I've been in the medical field like over forty (40) years total and I just remembered what I was taught in school that someone's - - - and - and I'm not trying to be facetious or anything. I just remember what I was trained. If someone starts talking erratic or - or saying - - - you know, like hallucinating or - or fantasizing or something, you don't intimidate them. You don't make them mad. You don't make them hostile. You - you just try to pacify them and get - - - - basically I just wanted to get her off the phone.

The appellant further explained that he thought the victim was talking about grabbing his groin after he refused to give her more medication when she talked about being "easy" and that he did not know what to think when she started talking about his penis.

On appeal, the appellant "contends that his responses do not rise to the level of a statement, as intended under the definition of the Tennessee Rules of Evidence nor under the definition of

assertion adopted by the court in State v. Land [34 S.W.3d 516 (Tenn. Crim. App. 2000)]" and that the trial court's decision to charge the jury on admission against interest improperly influenced the jury's verdict.

In Helton v. State, 547 S.W.2d 564 (Tenn.1977), the Tennessee Supreme Court set forth a definition for admissions against interest. The Supreme Court stated:

> The distinction between an admission and a confession is blurred. Generally, however, "a 'confession' is a statement by the accused that he engaged in conduct which constitutes a crime. . . . An admission is an acknowledgment by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgment of guilt itself. An admission, then, is something less than a confession and, unlike a confession, . . . an admission is not sufficient in itself to support a conviction.

Id. at 567 (quoting 3 Wharton's Criminal Evidence (13 ed. Torcia 1973), §§ 662 and 663); see also State v. Kyger, 787 S.W.2d 13, 23 n.2 (Tenn. Crim. App. 1989). While the statements made by the appellant during the telephone conversation herein are certainly not a confession, the statements can be construed as an admission against interest.[5] See generally State v. Antonio George White, No. 775, 1987 WL 25166, at *1 (Tenn. Crim. App. at Knoxville, Dec. 1, 1987) (stating that defendant's statement denying involvement in the crime but admitting being at the crime scene with another perpetrator was an admission under Helton). During the conversation herein, the appellant admitted that he was in the victim's room and responded positively to questions, which, when considered along with the victim's version of the events, tend to establish the appellant's guilt.

Because we have determined that the appellant's statement can be construed as an admission against interest, we must determine if the trial court properly charged the jury. Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). There is no requirement that a trial court be limited to using pattern jury instructions. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

At the conclusion of the trial, the trial court instructed the jury as follows:

---

[5]We note that in order to be considered an admission against interest under the Helton standard, the statement must only contain an "acknowledgment by the accused of certain facts which tend together with other facts, to establish his guilt." 547 S.W.2d at 567. There is no requirement, such as there is for the "statement against interest" exception to the hearsay rule, that the statement must be against the declarant's pecuniary or propriety interest or must tend to subject the declarant to civil or criminal liability at the time the statement is made. See Tenn. R. Evid. 804(b)(3).

Alleged statement against interest. Evidence of an alleged admission has been introduced in this case. An admission is an acknowledgment by the defendant of certain facts which ten- which tend, together with other facts, to establish his guilt. It must be corroborated by other independent evidence to warrant and support a conviction.

The Court has permitted the - the alleged admission as evidence, but it remains your duty to decide if, in fact, such statement was ever made and if such alleged statement was an admission. If you do not believe it was ever made, you should not consider it. If you decide the statement was made, you must then judge the truth of the facts stated and if the alleged statement was an admission. In determining whether the statement is true and an admission, you should consider the circumstances under which it was made. You should also consider whether any of the other - other evidence before you tends to contradict the statement in whole or in part. You should not arbitrarily disregard any part of the statement, but should consider all of the statement you believe to be true and if it is an admission - and if it is an admission.

If you find the statement is true and an - and - if you find the statement is true and [an] admission, you are the sole judges of the weight that - that should be given it. You should consider it along with all the other evidence in the case in determining the defendant's guilt or innocence.

The trial court also informed the jury that it was the jury's province to determine what weight, if any, the statements proven in the case should carry. The court additionally informed the jury that it might take any statement in consideration with all the other facts and circumstances proven in the case. Elsewhere in the instructions, the trial court instructed the jury as to credibility of the witnesses, stating in pertinent part:

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of different witnesses, you must reconcile them, if you can, without hastily or rationally concluding that any witness has sworn falsely for the law presumes that all witnesses are truthful. In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his general character, the evidence, if any, of the witness' reputation for truth and veracity, the intelligence and respectability of the witness, his interest or lack of interest in the outcome of the trial, his feelings, his apparent fairness or biases, his means of knowledge, the reasonableness of his statements, his appearance and demeanor while testifying, his contradictory statements as to the material matters, if any are shown, and all of the evidence in the case tending to corroborate or to contradict him.

After reviewing both the tape-recorded conversation and the corresponding jury charge, we conclude that the trial court properly gave the instruction on admission. Further, the trial court's instruction

clearly stated that it was the jury's responsibility to determine whether the appellant had made any admission and if he had, to determine whether the statements were entitled to any weight. The jurors were additionally instructed that they were the sole judges of the facts and of the law as it applied to the facts in the case. We conclude that the trial court's instructions contained an adequate statement of the law. Although the pattern jury instructions do not contemplate an "alleged" admission against interest, the instruction provided is otherwise virtually identical to the instruction on admission against interest contained in the Tennessee Pattern Jury Instructions. See T.P.I.– Crim. § 42.11(a) (4th ed.1995). The trial court in the case herein merely changed the language in the charge from "admission" to "alleged admission." This dilution of the jury charge by addition of the modifier "alleged" could only have inured to the appellant's benefit.

It was the responsibility of the jury to determine whether these statements were made, whether they were truthful, and what weight the statements should have been given in determining guilt or innocence. In our view, the instruction was proper. It allowed the jury to consider the surrounding circumstances and determine, in proper context, if the defendant was acknowledging culpability. That was the correct procedure. In summary, it is our view that the trial court provided essentially correct and adequate instructions to the jury. This issue is without merit.

Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the case herein, the appellant was charged with rape, a violation of Tennessee Code Annotated section 39-13-503. After hearing all the evidence at trial, the jury convicted the appellant of the lesser-included offense of sexual battery, a violation of Tennessee Code Annotated section 39-13-505. Sexual battery is defined as:

-13-

[U]nlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent; (3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or (4) The sexual contact is accomplished by fraud.

Sexual contact includes:

[T]he intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other persons intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification

Tenn. Code Ann. § 39-13-501.

In the case herein, the State's proof consisted primarily of the testimony of the victim. The victim's story, recounted in detail above, included allegations that the appellant came to her hospital room in the middle of the night, kissed her against her will, forced her to touch his erect penis, exposed his genitalia to her, and forced his penis into her mouth. Further, she testified that he masturbated to ejaculation in her presence. There was no testimony to corroborate the victim's version of the events. The defense proof consisted primarily of the testimony of the appellant. The appellant admitted that he visited the victim's hospital room, but he denied that he had any type of sexual contact with her. Instead, he testified that the victim demanded medication and, when he refused to provide that medication, grabbed him in the groin and threatened to "cry rape" if he did not comply. According to the appellant, the victim's grasp on his groin caused him to secrete prostatic fluid that he cleaned off with a pillowcase that he found in the bathroom. The appellant claimed he then fled the room. The appellant also testified that he agreed with all the statements made by the victim during the telephone conversation to "pacify" her because he thought she was crazy.

It is not the duty of this Court to assess the credibility of witnesses on appeal, that function is the duty of the trier of fact. See generally, State v. Adkins, 786 S.W.2d 642, 646 (Tenn. 1990); State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Considering the testimony of the victim, along with the tape-recorded telephone conversation, as well as the testimony of the appellant, there was sufficient evidence to support the jury's verdict of sexual battery. The case herein truly presents the classic "he said/she said" scenario. Because of the nature of the allegations, witness credibility no doubt played a crucial role at trial. As noted, the determination of the weight and the credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are matters entrusted exclusively to the trier of fact, in this case the jury. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The jury herein resolved the question of witness credibility upon rendering

a verdict of guilt for the lesser-included offense of sexual battery. Implicit in the jury's verdict is determination that the victim was a credible witness. We conclude that the evidence presented at trial was sufficient for a rational trier of fact to find the essential elements of sexual battery beyond a reasonable doubt. This issue is without merit.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

JERRY L. SMITH, JUDGE