**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0322n.06

**No. 09-6406**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***May 16, 2011***

LEONARD GREEN, Clerk

WALDO WIGGINS,                           )
                                          )
          Petitioner-Appellee,            )
                                          )
v.                                        )     ON APPEAL FROM THE UNITED
                                          )     STATES DISTRICT COURT FOR THE
TONY PARKER,                              )     WESTERN DISTRICT OF TENNESSEE
                                          )
          Respondent-Appellant.           )
                                          )

Before:  SUTTON and STRANCH, Circuit Judges; WELLS, District Judge.[*]

SUTTON, Circuit Judge.  A Tennessee jury found Waldo Wiggins guilty of murdering his pregnant girlfriend.  The state courts rejected his direct appeal and his request for post-conviction relief.  Wiggins filed a federal habeas petition, and the district court granted it based on a lack of sufficient evidence and ineffective assistance of counsel.  We reverse.

I.

On April 13, 1999, 17-year-old Tatrina Terry arrived home from work around 10 p.m.  She was 20-weeks pregnant at the time.  Terry told her mother she planned to go out again, and told her friend Rodriquez Dean (by phone) that she intended to see "her baby's father."  R.10-2 at 41.  Terry

---

[*]The Honorable Lesley B. Wells, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

abruptly ended the call with Dean, saying she had to go, "as if somebody had paged her or called her." *Id.* At some point between 11:15 and 11:30 p.m., a neighbor heard Terry's car leave her house.

Waldo Wiggins, also 17 years old at the time, lived in a trailer with his parents, about a 15–20 minute drive from Terry's house. Wiggins and Terry had a romantic relationship, and he believed he was the father of Terry's baby. The two had previously discussed the possibility of an abortion, though they decided against it. On the night of April 13, Wiggins told his mother that Terry was coming to their house.

According to Terry's phone records, she called Wiggins several times from her cell phone between 11:38 and 11:56 p.m. The first five calls went unanswered. Wiggins answered the sixth call, at 12:02 a.m., and spoke to Terry for one to two minutes. Wiggins' phone log suggests that he subsequently spoke with another girlfriend, Jennifer Bonaparte, at 12:46 a.m. for two minutes, and then again with Bonaparte for a much longer period of time, apparently from 1:05 a.m. to 4:46 a.m.

Between 5:00 and 6:00 a.m. on April 14, Terry's mom realized her daughter was missing. By using the *69 feature on her home phone, she learned that the last phone call to their house had come from the Wiggins' house.

Around 6:30 a.m. that morning, John Martin and his uncle, while driving to work, noticed a car off the side of the road in a field, with a white object beside it. Thinking someone was "stripping" the back seat of the car, they did not stop. R.10-2 at 53. On their way home from work

at 11:30 a.m., they saw the same car again and pulled over. When they realized the white object was a dead body, they called the police.

Terry had died from three gunshot wounds to the head. The presence of soot inside the skin suggested contact wounds, namely that the killer had fired the gun with the muzzle against her head. The investigator at the scene, Ronnie Coleman, saw no signs of scrapes or bruises that would suggest a struggle. The keys remained in the ignition, and the police found Terry's cell phone and portable CD player in the car. The police did not find tire tracks from any other car at the scene.

According to the autopsy, Terry showed signs of smothering, as though someone had forcefully covered her mouth and nostrils with his hand. The examiner also found vaginal abrasions, suggesting either "nonconsensual sex" or "sex that wasn't lubricated" at some point before her death. R.10-4 at 21. Investigators later determined that Wiggins was not the father of the baby Terry had been carrying, and the would-be father to this day remains unknown.

When the police learned that Terry planned to go to Wiggins' house on the night of her death, they suspected Wiggins was involved, as the murder scene was a half mile away "as a crow flies" from his house. R.10-4 at 44. That night (April 14), the police interviewed Wiggins and his parents, who all claimed he was at home with his parents the night before and that Terry never showed up. Both parents acknowledged that they could not have known if Wiggins had slipped out quietly during the night because they were asleep and because Wiggins' room was on the opposite end of the trailer.

During the interview, Wiggins maintained he had spoken with Terry just once on the phone the night before. The officers found Wiggins "deceptive," R.10-5 at 117, and when they showed him telephone records suggesting six phone calls between him and Terry, Wiggins recanted and admitted to multiple conversations. At that point, he stopped cooperating and turned evasive, "couldn't hardly answer a question" and acted "down and out." R.10-4 at 55. It turned out that the telephone records demonstrated there were five *attempted* calls and only one connected call, as the phone records showed Terry had completed only one call to Wiggins.

When Investigator Jerry Dyson asked Wiggins' father whether they kept any guns in the house, the father denied that the family had any. But he later changed his answer and acknowledged that they kept guns in the house and consented to a search of their home. On April 15, the mother led police to a purse in her bedroom closet that contained four handguns. Investigator John Fletcher said that one of the guns, a .22 caliber revolver, smelled like gunpowder, suggesting it had recently been fired. He also noticed that "oil had been put on" the barrels of all four guns, as if someone had tried to clean them. R.10-5 at 74. Wiggins knew the guns were hidden in the bedroom closet, was "familiar with" the .22 caliber pistol, and had "fired it on occasion." R.10-2 at 86. None of the visitors who frequented the Wiggins' home knew where the guns were hidden.

The police sent the .22 caliber revolver and other evidence to a state crime lab. A few months later, the crime lab concluded that the bullet fragments from Terry's skull came from the .22 caliber pistol, and that traces of blood on the gun matched Terry's DNA.

On October 25, after receiving the crime lab report, the police interviewed Wiggins again. When they showed Wiggins the .22 caliber gun, he "kind of stood up in his seat and backed up approximately two feet from the table, as if he was in shock." R.10-5 at 38. Wiggins denied that it could have been the murder weapon, stating that only he, his uncle and his father had ever fired the gun before.

In March 2000, a Tennessee grand jury indicted Wiggins for first-degree murder. A jury convicted Wiggins, and the court sentenced him to life in prison. After losing his appeals in state court, Wiggins filed a federal habeas petition. The district court granted the petition on two grounds: (1) the State introduced insufficient evidence to convict Wiggins, in violation of the Due Process Clause of the Fourteenth Amendment, and (2) defense counsel failed to object to a jury instruction regarding evidence of an admission against interest, in violation of the right to effective assistance of counsel under the Sixth and Fourteenth Amendments.

II.

The Fourteenth Amendment requires the State to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–316 (1979). The constitutional inquiry, once a jury has convicted a defendant, is whether "*any* rational trier of fact" could find the defendant guilty "beyond a reasonable doubt" after construing the record "in the light most favorable to the prosecution." *Id.* at 319. Because the state courts resolved this sufficiency-of-the-evidence claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) applies, meaning that

we may not grant the writ unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Only if the state court's decision was "objectively unreasonable," *Sanborn v. Parker*, 629 F.3d 554, 577 (6th Cir. 2010), only if in other words no "fairminded jurists" could resolve the case the way the state courts did, *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786 (2011), may we grant the writ.

The state courts reasonably rejected Wiggins' sufficiency claim. When construed in favor of the State, the evidence supports the conclusion that a "rational trier of fact" could find Wiggins guilty beyond a reasonable doubt.

*The murder weapon*. The evidence showed that the murder weapon was a .22 caliber pistol. The Wiggins family owned the gun, and the police found it in the Wiggins trailer about a day after the murder. Only the members of the Wiggins family, just three of whom were home that night, knew where the family kept the guns, and only they had access to the closet where the .22 caliber was hidden. Waldo Wiggins knew where the gun was, and he knew how to use it.

*Access to the murder weapon on the night of the murder*. Wiggins and his parents were the only people at their home on the night of April 13. Because Terry was on her way to the Wiggins trailer that night and because the murder weapon was in the trailer, a rational jury could conclude that this left three suspects: Wiggins, his mother and his father.

A jury reasonably could eliminate the parents as suspects. The mother went to bed at 11:00 p.m., after watching the same TV show she watched every night. She never owned or shot any of the family's guns, and she was the one who told the police where the .22 caliber pistol was. Wiggins' father went to bed at 10 p.m., having started the day drinking at 2:30 p.m. (considered late for him; he usually started at 8:00 am). Having previously suffered three heart attacks, he also was not physically fit to "run down the road," let alone the half mile from the murder site to the home. R.10-2 at 66. Neither parent had any reason to kill Terry. They hardly knew her, and both testified that before the murder they did not know Terry was potentially carrying their son's baby.

*Return of the murder weapon to the Wiggins' home.* Someone put the gun back in its hiding spot in the Wiggins' home, undetected, shortly after killing Terry. Someone also had the time to clean that gun and the other three guns with which it was stored. Wiggins' mom testified that between the time of Terry's murder and the time that the police confiscated the murder weapon about a day later, various people, including relatives and Wiggins' boxing teammates, went in and out of the house. But none of these people knew Terry, none of them had access to the closet with the gun and none of them knew where the family guns were hidden. None, that is, except Wiggins.

Wiggins is the only person who had access to the murder weapon, had any connection to the victim *and* could return the weapon to the closet before the police found it. Unlike his father, Wiggins was in excellent physical shape and could easily run the half-mile distance from the murder scene, across bean or cotton fields and over several fence rows, back to his house, and eventually put the gun back in his parents' closet. The evidence also suggests Terry knew the murderer because

the police found no evidence of other tire tracks at the scene (suggesting Terry and the murderer were in her car together) and Terry's valuables remained in the car. Nor should it be forgotten that Terry's last phone call went to Wiggins' house around midnight.

In the light cast by this evidence, a reasonable jury (and reviewing state court) could decide that Wiggins committed the crime. To think otherwise about the matter requires a remarkable confluence of events—that a stranger snuck into the Wiggins' trailer, located the .22 caliber hidden in a purse in the bedroom closet, somehow met up with Terry that evening, killed her (without taking her valuables), ran back to the trailer, then put the gun back in the parents' bedroom—all while escaping detection from every member of the Wiggins family. To suggest instead that the killer was one of the Wiggins' relatives or friends also requires a suspension of disbelief. Not one of these people knew Terry or had any reason to kill her, and most of them did not have access to the murder weapon or even know where it was. On this record, we cannot say that the state courts' decision to uphold the conviction was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786–87.

No direct evidence, it is true, places Wiggins at the crime scene, whether that evidence comes in the form of a fingerprint or DNA evidence. For reasons of their own, the local investigators did not preserve Terry's clothes or perform any DNA tests on them, apparently opting to focus their efforts on testing the bullets and .22 revolver. But that does not change the sufficiency calculus. Time after time the courts have held that "[c]ircumstantial evidence alone is sufficient to sustain a

conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (quoted case omitted); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction . . . ."); *Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence. . . . In both, the jury must use its experience with people and events in weighing the probabilities."); *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) ("[P]hysical evidence is not a prerequisite to sustaining a conviction.").

*Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008), does not lead to a different conclusion. There, the victim, a well-known drug dealer, was killed at home in a robbery. The next day, two people found a gym bag alongside a road containing weapons possibly linked to the crime. The defendant previously owned one of the guns and was seen with it two weeks before the murder. *Id.* at 794. But the State presented no evidence that the defendant (1) had possessed the gun on the day of the murder, (2) planned to rob the victim or (3) had possessed the gun between the murder and its discovery on the road. We granted the habeas petition due to the absence of evidence placing him at the scene of the crime. *Id.* at 797. At the same time, however, we noted that "if the witness had observed the gun in [defendant's] house only a day before the homicide and had been more certain that it was indeed the same gun as that used in the homicide, there would be a stronger inference that [defendant] was present." *Id.* at 797 n.4.

*Newman*'s caveat describes this case. Unlike *Newman*, the victim planned to see Wiggins shortly before her death and spoke to him shortly before her death. That places Wiggins and the victim together that night near the scene of the crime, only a half a mile from his house. Unlike *Newman*, the Wiggins family owned the weapon immediately before and after the murder. And unlike *Newman*, the police found the gun returned to its original hiding spot in the Wiggins' house, not abandoned on the side of the road. In view of this evidence, the jury could draw a much "stronger inference that [Wiggins] was present" at the crime scene. *Id.*

Wiggins persists that, when the ballistics expert testified about the match between the murder weapon and the Wiggins' gun, he identified the .22 caliber gun using a non-existent exhibit number. But this contention "overlooks arguments that would otherwise justify the state court's result," *Harrington*, 131 S. Ct. at 786, namely the likely (indeed far more likely) possibility that the expert misspoke. The ballistics expert testified that he was "[a]bsolutely positive" that the bullet fragments came from "that .22 revolver," R.10-5 at 134, and only one ".22 revolver" was involved in this case: the one from Wiggins' house. A second expert, a serologist, testified that Terry's blood "is the same blood that [he] examined on that .22 revolver," *id.* at 146–47, and this expert made no mistake with regard to his exhibit numbers. It is difficult to fault a jury and reviewing court for dismissing what appears to be a misstatement in favor of the clear testimony (not rebutted at trial) that the .22 caliber from the Wiggins' house was the murder weapon.

Wiggins separately claims that the State failed to prove that he acted with premeditation. But if Wiggins was the killer, as the above evidence establishes, it takes few additional inferences to

conclude that Wiggins' "intent to kill [was] formed prior to the act itself." Tenn. Code. Ann. § 39-13-202(d). Under Tennessee law, several factors may suggest premeditation: "declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). The evidence permits the reasonable inference that several of these factors applied: Wiggins took the gun from its hiding spot, shot Terry at point blank range, cleaned the gun and returned it, while staying calm enough to participate in a boxing tournament two days later. A jury and reviewing court reasonably could find that Wiggins acted with premeditation.

### III.

Also unavailing is Wiggins' claim that he received ineffective assistance of counsel. To prevail, Wiggins must show that "counsel's representation fell below an objective standard of reasonableness" and that this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). We apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Since the reviewing court adjudicated this claim on the merits, AEDPA applies, and "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

Wiggins' theory of ineffective assistance is that his counsel failed to object to the following jury instruction:

> Evidence of an admission has been introduced in this case. An admission is an acknowledgment by the defendant of certain facts which tend, together with other facts, to establish his guilt. It must be corroborated by other independent evidence to warrant and support a conviction. The Court has permitted admission of this evidence, but it remains your duty to decide if in fact such statements were ever made. If you do not believe it was ever made you should not consider it. If you decide the statement was made, you must then judge the truth of the facts stated. . . . [Y]ou are the sole judge of the weight that you should give to it.

R.10-7 at 47–48. The instruction, as Wiggins sees it, improperly commented on the evidence.

We cannot agree. This instruction is "virtually identical" to the instruction contained in Tennessee's 1995 Pattern Jury Instructions. *State v. Litton*, 161 S.W.3d 447, 458–59 (Tenn. Crim. App. 2004). And it does not amount to a comment, let alone an impermissible one, on the evidence by the trial judge. The instruction simply points out that the prosecution had introduced statements admissible under the hearsay exception for admissions by party opponents, *see* Tenn. R. Evid. 803(1.2); *cf.* Fed. R. Evid. 801(d)(2), also sometimes known as "admissions against interest," *see State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007). Contrary to Wiggins' argument on appeal, the trial court did not suggest that Wiggins had confessed to the crime. *See Litton*, 161 S.W.3d at 457 ("An admission . . . is something less than a confession.") (quoted case omitted).

The trial court instead instructed the jury that it had admitted statements that contained "an acknowledgment by [Wiggins] of certain fact[s] which tend, together with other facts, to establish his guilt," R.10-7 at 47, a statement that merely parrots the definition of an admission against

interest, *see Litton*, 161 S.W.3d at 457 n.5.  These pieces of evidence included Wiggins' responses when police showed him phone records and the murder weapon, and his reaction upon hearing about Terry's death from his mom, *see* R.10-3 at 57 (Wiggins started sucking his thumb and responded, "They found her?  Where she was? . . . Where they found her at?").  These statements suggest Wiggins may have known more than he was letting on, and "tend[ed], together with other facts, to establish his guilt."  That Wiggins feels otherwise about what he said is irrelevant.  *See Lewis*, 235 S.W.3d at 145 ("Anything the opposing party said or wrote out of court is admissible in court against that party.  Whether the statement was disserving or self-serving when made is immaterial." (quoted source omitted)).

More to the point, the trial court expressed no opinion about whether this evidence inculpated Wiggins.  To the contrary, it emphasized that "it remains your duty to decide if in fact such statements were ever made" and that "you are the sole judge of the weight that you should give to it."  R.10-7 at 47–48.  All of this eliminated any chance the jury could misread the trial court's Pattern Instruction as lending any particular weight to the evidence.

Wiggins argues otherwise, citing a non-AEDPA decision, *United States v. Yates*, 553 F.2d 518 (6th Cir. 1977), for support.  In *Yates*, the prosecutor asked if he could read the defendant's written confession to the jury.  The court responded, "The written statement of the admissions or confession, or whatever you want to call it, as made by this Defendant is in evidence and the jury will have an opportunity to read it, so it will not be read to or by the jury at this time.  It is *clear in the record* from the testimony of [investigators] that this Defendant *did admit his participation* in

- 13 -

this bank robbery." *Id.* at 520 n.1 (emphasis added). We held that this comment "struck directly at the heart of [the defendant's] defense; it negated [his] claim that he did not make the confession." *Id.* at 520.

*Yates* involved a judicial comment on the evidence, not the delivery of a pattern jury instruction. Today's instruction did not suggest that a confession had "clear[ly]" been made. The trial court, while mentioning the presence of evidentiary admissions, expressed no opinion on what weight to lend them or whether they even had been made. A lawyer does not provide ineffective assistance by failing to object to a valid jury instruction. Wiggins fails to carry his high burden to show the state court's application of the *Strickland* standard was unreasonable. *Harrington*, 131 S. Ct. at 785.

IV.

For these reasons, we reverse.