IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2021 Session

## STATE OF TENNESSEE v. JERRY CARTER, SR.

**Appeal from the Criminal Court for Shelby County**
**No. 16-05745     James M. Lammey, Jr., Judge**

_____

### No. W2020-00478-CCA-R3-CD

_____

The Defendant, Jerry Carter, Sr., appeals from his jury convictions for three counts of rape of a child, three counts of incest, three counts of soliciting the sexual exploitation of a minor, and one count of child abuse and his resulting sentence of 168 years, 11 months, and 29 days.  On appeal, the Defendant argues that (1) the trial court erred when it ruled that the Defendant's prior 2003 convictions for statutory rape and sexual battery were relevant and admissible; (2) the trial court's rulings regarding the defense's ability to cross-examine witnesses impermissibly restricted the Defendant's right to put on a defense; (3) the trial court erred when it characterized the text messages between the Defendant and one of the victims as a confession or admission against interest and gave the jury the corresponding instruction; and (4) the cumulative effect of the errors entitle him to a new trial.  Though we do not find that any of the issues raised by the Defendant entitle him to relief, we remand this case due to errors with the judgment forms—there was no judgment form entered for Count 8 (aggravated sexual battery), which was dismissed, and the trial court's imposed sentences of twelve years for both Counts 9 and 10, but the judgment forms incorrectly reflect sentences of eight years.  In all other respects, the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Ramon Damas (on appeal), and Claiborne H. Ferguson (at trial), Memphis, Tennessee, for the appellant, Jerry Carter, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the Defendant's perpetrating a number of sexual offenses on his two biological children, D.B.C. and J.C.J.,[1] between December 3, 2006, and December 3, 2011. On October 4, 2016, the Shelby County Grand Jury returned an eleven-count indictment against the Defendant, charging him with Count 1, rape of a child (D.B.C.); Count 2, rape of a child (J.C.J.); Count 3, rape of a child (D.B.C.); Count 4, incest (D.B.C.); Count 5, incest (J.C.J.); Count 6, incest (D.B.C.); Count 7, child abuse (J.C.J.); Count 8, aggravated sexual battery (D.B.C.); Count 9, soliciting the sexual exploitation of a minor (J.C.J.); Count 10, soliciting the sexual exploitation of a minor (D.B.C.); and Count 11, soliciting the sexual exploitation of a minor (J.C.J.). See Tenn. Code Ann. §§ 39-13-504, -13-522, -13-529, -15-302, -15-401. The matter proceeded to a jury trial held on November 18 through November 22, 2019.

A. Pre-Trial. After the jury had been selected but before the trial began, the trial court held a jury-out hearing regarding events that took place in 2003. The State noted that in 2003, the Defendant pled guilty to statutory rape and sexual battery based on offenses committed against "two young women who were friends of the family." The parties agreed that based on those convictions, D.B.C. and J.C.J. were interviewed by the Department of Children's Services ("DCS") and made disclosures of inappropriate sexual contact, but that those disclosures could not be confirmed.

Defense counsel argued that the convictions were inadmissible. However, defense counsel indicated that he planned on "going into" the forensic interviews of the children and that he had no "problem if the State [went] into it" because it was "part of the case and part of the process through which these kids have lived." Defense counsel continued, "[I]t also indicates that early on they were making allegations of a sexual nature against [the Defendant] that to some extent were either unsubstantiated or not followed up on."

The trial court noted that the victims were interviewed specifically because of the 2003 convictions and stated that "if any of it [was] going to come in, . . . fairness would say all of it ha[d] to come in" to "tell a complete story how this came about." It then conducted an analysis under Tennessee Rules of Evidence 404(b), noting that a hearing was being held outside the presence of the jury, and finding "clear and convincing evidence that [the convictions] exist[ed]." It ruled that the convictions were "being offered to tell the complete story of the case" rather than to show propensity. Finally, along with emphasizing the distinction between Tennessee Rules of Evidence 403 and 404(b) in

---

[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials.

balancing probative value against the risk of unfair prejudice, the trial court determined that the convictions were "highly relevant and probative."

During the pre-trial discussion, defense counsel mentioned that he sought to introduce evidence of "allegations of sexual abuse that [were] filed in Arkansas" by another minor victim against the Defendant but that were ultimately dismissed. According to defense counsel, E.L.C.,[2] the victims' mother and the Defendant's ex-wife, paid the Arkansas victim's father "to push" that case against the Defendant, and those allegations were dismissed in 2013 when the victim's father went to court and stated such. Defense counsel averred that shortly after that case was dismissed, the victims in this case made the disclosures that led to the present allegations. Defense counsel indicated that through this evidence, the defense sought to show that the victims fabricated the present allegations in an attempt to have the Defendant's parental rights terminated.

The trial court observed that "it sounded like [the defense was] going to try to say that the mother [was] the instigator of all this just because of the parental rights [issue]" and that if that was the case, "[i]t seem[ed]" like the prior 2003 convictions were relevant because she did not get her children to make up something "when she had ample opportunity to point to other kids." The trial court reiterated, "[I]f you're going to paint this picture, shouldn't all of it come in? I mean the fact that he was convicted sounds relevant to me now." The State responded, "[I]f we're going to talk about the cases that were dismissed and say that mom made up those cases or mom paid people . . . to paint him in a corner to get custody of her kids . . . , then I do think that the cases that he's pled guilty to are relevant." The trial court agreed, ruling that "if part of the defense [was] that the mother put them up to it," it made the 2003 convictions relevant. On the other hand, the State conceded that "if defense counsel [did not] intend to go into any of it," then there was "an extreme limit on how much" evidence regarding prior cases the State could likewise permissibly develop. The trial court later repeated that accusing the victims' mother of paying individuals or fabricating allegations of abuse made "it much, much more probative talking" about the initial convictions.

B. <u>Trial</u>. The victims' mother explained that J.C.J. was born in 1998, that she married the Defendant in 1999 while she was pregnant with their second child, and that subsequently D.B.C. was born that same year. The victims' mother stated that she and the victims lived together with the Defendant during that time, though the victims' mother explained that she sometimes lived "off and on" with her mother because the victims' mother had three older children of her own. Thereafter, the victims' mother moved with the victims to Texas sometime in 2002 or 2003, and the Defendant did not accompany the family. Prior to moving, the victims' mother had initiated divorce proceedings against the

---

[2] In an effort to further protect the identity of the victims, we will refer to their mother by her initials.

Defendant, which were finalized after her move to Texas. The victims' mother was awarded full custody of the victims.

The victims' mother testified that she and the victims returned to Memphis "sometime around" 2006 and resided in the Frayser area with her sister and sixteen-year-old niece. After returning to Memphis, the victims' mother rekindled her relationship with the Defendant, and the Defendant eventually moved back in with the family in Frayser. About two or three months later, the victims' mother, the Defendant, and the victims then moved in with a friend of the Defendant's named April. According to the victims' mother, multiple members of April's family also lived in the residence. After a "couple of months" at April's residence, they found a place close by to rent on Pallwood Road, and the victims' mother, the Defendant, and the victims moved to that location. The four of them resided at that residence for several years before moving to Collierville. The victims' mother confirmed that April's residence, the Pallwood home, and the Collierville home were all located in Shelby County. She further provided that the Defendant worked as "a wrecker driver" during this time and that he did not "keep regular" hours, sometimes working "during the day and at night."

In 2011, the family left Collierville and moved to Sweetwater in East Tennessee. According to the victims' mother, the Defendant lived with her and the victims in Sweetwater, but when the couple later separated permanently, the victims' mother moved with the victims to Fort Payne, Alabama in September 2013. During the moving period, the victims each spent some alone time with the Defendant, though she could not recall where precisely the Defendant was living at that time.

Approximately two months after they moved away from the Defendant to Alabama, both victims disclosed to the victims' mother that he had sexually abused them. The victims' mother explained that on November 5, 2013, she was in her kitchen when J.C.J. told her that "[t]here was an incident that had happened where [D.B.C.] had woke up and her butt was wet and so were her panties and [the Defendant] had blamed it on [J.C.J.] and [J.C.J.] told [his mother] that it was not him, that it was [the Defendant] because he had walked in on what he had seen." According to the victims' mother, when J.C.J. first started relaying the story, D.B.C. went to her room to hide. At first, the victims' mother thought J.C.J. was lying because she "didn't want to believe a dad would do that to a kid." The victims' mother summoned D.B.C. back downstairs; however, D.B.C. was too traumatized to speak, so she wrote on a piece of paper that J.C.J. was in fact telling the truth about the abuse. The victims' mother then called the police.

The victims were interviewed at the Child Advocacy Center ("CAC") in Alabama about the alleged abuse. After the victims talked with the CAC, the victims' mother learned that the abuse had been taking place "over many years[.]" Though the victims' mother's information originally came from the CAC, the victims began to tell her more as time

- 4 -

passed. The victims' mother confirmed that according to the information she had received from the victims, the abuse took place at both the Pallwood house and the home in Collierville.

Though the victims' mother never suspected that the victims were being abused, she recalled a time at the Pallwood house when she was cleaning out the garage, and when she went inside to use the bathroom, heard D.B.C. screaming. The victims' mother went to D.B.C.'s bedroom, pushed open the bedroom door, and saw the Defendant lying on top of the victim; the victims' mother could see that the Defendant's pants were "pulled down some" and could see his "butt crack." The victims' mother told the Defendant to leave the victim alone and proceeded to the bathroom. She heard the Defendant say something to the victim, and when she came out of the bathroom, she returned to the victim's bedroom still yelling at the Defendant to leave the victim alone. According to the victims' mother, the Defendant said "he was just playing with her," but the victim was screaming, "no, you weren't, no, you weren't." As she entered the victim's bedroom, she saw that the Defendant's pants were unzipped and that he was not wearing underwear. The Defendant explained to the victims' mother that "his zipper was falling down [and that] he was just messing with [the victim], playing with her and she was getting mad." When the victims' mother asked the victim if she was okay, the victim "kind of glanced up at [the Defendant] when he was leaving and . . . really didn't say anything" but "just shook her head yeah[.]"

The victims' mother indicated that the Defendant did not treat the two children equally, providing as an example that the Defendant would take both children to the store but only buy D.B.C. something, which would upset J.C.J. When asked if the Defendant had ever physically abused J.C.J., the victims' mother said that she had "seen bruises" and that the Defendant "was rough with [J.C.J.] all the time." The victims' mother testified that she often encouraged the Defendant to have "prayer time" with the victims, that prayer time occurred most often at bedtime, that the Defendant often prayed more with D.B.C. than J.C.J., and that when the Defendant prayed with D.B.C., the bedroom door would be "cracked."

On cross-examination, the victims' mother confirmed that she wrote a letter to the Defendant, and the letter, which was postmarked October 15, 2013, was admitted as an exhibit by the defense. When asked if the Defendant was in jail at the time she wrote the letter, she answered affirmatively.[3] In the letter, it was mentioned that the victims' mother was angry with the Defendant for sending a letter directly to her house because she did not want her "Christian landlord" to see the county jail's "red stamp" on it. She indicated that she was also angry with the Defendant because she "had just had a huge blowup on Facebook" with the Defendant's wife and another child of the Defendant's; according to

---

[3] From context, it appears that the Defendant was in jail for the Arkansas allegations levied by the other minor victim that were allegedly later recanted by that victim's father.

the victims' mother, this argument centered on allegations that "they had gypped [her]" and called her "a whore, liar, a manipulator, a psychopath and a lot of other things" due to the Defendant's lies about her. The victims' mother also requested in the letter that the Defendant relinquish his parental rights and allow her new husband to adopt the victims. It was further noted in the letter that the Defendant had been in trouble for "cheating" and "over Ashley and Amanda's case on [him]," and at the end of the letter, the victims' mother wished the Defendant "good luck with [his] case." The letter was signed by the victims' mother, her husband, and both victims.

The victims' mother also agreed that she had seen certain text messages between the Defendant and D.B.C. that were sent between July and August of 2013. In the course of the victims' mother's cross-examination, photographs of these text messages were entered into evidence for identification purposes.[4] The victims' mother confirmed that during the timeframe of the text messages, when D.B.C. would get in trouble, she would say that she wanted to go live with the Defendant.

In one message, D.B.C. stated that she wanted "to go to court" so that the Defendant could obtain custody of her because she was "sick of th[a]t b---h of a mother and th[a]t f--king a--hole of a stepdad and th[a]t dumba-s brother." In another message, D.B.C. informed the Defendant, "Momma said she has a permanent parenting plan and the court can't overrul[]e it." D.B.C. later stated that her mother and stepdad "might be split[t]ing up," so they were "gonna be on the street." D.B.C. also told the Defendant that her mother lied to her often, indicated that she was punished frequently, and that she wanted her mother declared "unfit." D.B.C. frequently told the Defendant in the messages that she loved him.

After D.B.C. told the Defendant that she and her mother had an argument, the Defendant responded as follows:

> I am the worst thing that has ever happened to you[.] I really don't feel worthy of anyone[']s love[.] I absolutely hate the things I have done and the ways that I have hurt people[.] I am a piece of s--t who doesn't even deserve to breathe[.] I don't wanna talk to anyone[.] I just want to stop existing! My only wish is that you could erase every memory of me.

The victim replied that she never wanted to forget the Defendant and that she wished he would "stop doubting and hating" himself.

---

[4] The photographs were later authenticated and admitted into evidence during D.B.C.'s testimony.

The victim continued, "[N]o one cares about the past[,] it[']s the future they care about[,]" to which the Defendant said,

> I don't deserve your love or your words[. Yo]ur life would b[e] destroyed if [yo]u allowed me back into it! I believe an eternity of hell is no match for a heartache of hurting those you love and leaving those you love[.] I am a destroyer of beautiful souls. I am so happy that I had the privil[e]ge of being you[r] DADDY!

The victim implored the Defendant to stop saying such things and described the Defendant as "a perfect daddy" and "the best daddy." She wished for him to "never stop being the way" he was, and she asked what had caused him to say such things. The Defendant answered, "[J]ust wishing I was a better father and could have been better to you and spent more time with you! I love you angel." D.B.C. said that the Defendant had been a good father and that she would get to see him more if they went to court, which was a reason for him to look forward to the future.

At some point, the victims' mother confiscated D.B.C.'s phone due to D.B.C.'s behavior and started exchanging text messages with the Defendant using D.B.C.'s phone. In the messages she sent to the Defendant, the victims' mother indicated that she was having problems with the victim due to the clothes the Defendant had allowed the victim to wear and the way that he had allowed the victim to act in public. The victims' mother informed the Defendant that the victim had an attitude problem with everyone and that the victim was out of control, for which the victims' mother blamed the Defendant because he was "too negative." When the Defendant asked for more information, the victims' mother stated that she was through talking with him and that she was "done w[ith] it all." The Defendant protested that he was not the cause of the victim's negative attitude and that he did not understand what was taking place. When the Defendant pressed further, the victims' mother continued to refuse to talk with him about it. The Defendant said, "I am not the monster [yo]u make me out to be[.] I have done a lot of bad in my life[,] and I have hurt you a lot[.] I have asked for forgiveness!" The Defendant asked for a set time to speak with the victims, noting that he paid for the victims' cell phones. The Defendant continued to send messages seeking to speak with the victims, but got no response. Eventually, D.B.C. got her phone back and texted the Defendant.

After discussing the text messages at trial, the victims' mother said that she spoke with the Defendant on a few other occasions, though she was not sure of the last time they talked. The victims' mother stated that she and the Defendant last lived together towards the end of March 2013, though the victims visited the Defendant sometime in the summer of 2013. The victims' mother said that she drove one child to Memphis, and then the other when she picked up the first child, but she could not recall which child visited the Defendant first. The victims' mother indicted that her new husband accompanied her on

- 7 -

these trips; however, while in the car, the children never made disclosures of any kind. Though the victims' mother was not legally required to take the victims to see the Defendant, she still thought it was good for them at this point. According to the victims' mother, the victims quit speaking with the Defendant altogether shortly after the text messages were exchanged in July and August of 2013. The victims' mother further corroborated that the victims had never to her knowledge made any disclosures to their respective teachers and that they had routinely been seen by a pediatrician.

The victims' mother indicated that she and the Defendant had a difficult relationship during their tenure. According to the victims' mother, the Defendant had no contact with the victims while they lived in Texas, and she and the Defendant had discussed "many times" terminating the Defendant's parental rights. The victims' mother verified that her new husband was an ex-police chief in Hammondville, Alabama and that he wanted to adopt the victims. According to the victims' mother, when they sent the October 2013 letter to the incarcerated Defendant asking him to terminate his parental rights, the Defendant replied with a letter stating no. The victims' mother acknowledged that she first spoke with the police about the allegations shortly thereafter in November 2013.

The victims' mother affirmed that she had written several things down in order for her to remember them so that she could convey them to the police—some notes were her own recollection and others were things the victims had told her. After reviewing her notes to the police, the victims' mother relayed one incident when she was outside cleaning out the garage "like [she] always did," and when she came inside to get something to drink, she heard the Defendant and J.C.J. yelling at each other. When the victims' mother went to see what was going on between the two, she observed the "a baseball bat [come] flying out of [J.C.J.'s] room," and the bat hit her before hitting the wall. According to the victims' mother, the Defendant was on top of J.C.J., and when she asked why, the Defendant said that J.C.J. was in trouble for refusing to clean his room and that J.C.J. had tried to hit him with the bat.

Also, in her notes, the victims' mother made references to finding condoms "all over the house[,]" specifically, she had found a box of unopened condoms in a cubbyhole space in D.B.C.'s bedroom. The victims' mother asked the Defendant about the condoms, but the Defendant did not provide any insight, claiming no knowledge of them. The victims' mother also confirmed that she found a used condom wrapper in D.B.C.'s bedroom floor and that the Defendant told her that it must have belonged to J.C.J. In addition, the victims' mother located a condom in the toilet after the toilet had clogged and she had to plunge it. Again, the Defendant said that it probably belonged to J.C.J., but when the victims' mother asked J.C.J. about it, he denied it. Once when the Defendant returned from a trip, the victims' mother saw the Defendant putting something up in the top of the hallway closet. When the victims' mother later went to look, it was a box of condoms. The victims' mother

again confronted the Defendant, and he again said that they were J.C.J.'s.  The victims' mother indicated that this cycle of finding condoms in the house occurred at least "six, seven, eight times," that she also found them in the Defendant's car, that the Defendant never provided her with any explanation for them, and that during this time, neither victim ever mentioned that the Defendant was sexually abusing them.  The victims' mother agreed that once the Defendant was incarcerated on these allegations, she and her new husband never proceeded with his adoption of the victims.

The victims' mother verified that in approximately 2012, about a year after the family moved to Sweetwater, she was diagnosed with a "fairly contagious" sexually-transmitted disease ("STD"), trichomonas.  Because she was symptomatic, she went to the doctor knowing something "wasn't right."  Because they were sexually active and did not use condoms, both she and the Defendant were treated for the STD.

On redirect, the victims' mother testified that for the entire time period from when they moved back to Tennessee in 2006 until they left for Alabama in 2013, D.B.C. did not want to be left at home alone with the Defendant.  The victims' mother said that D.B.C. would often "be very panicky" and would cry at the prospect of being left alone with the Defendant and that D.B.C. would beg her to stay home with them.  The victims' mother also said that the Defendant sometimes took the victims with him on "tow truck jobs," though he most frequently took D.B.C. because she was allegedly better "at keeping him awake[.]"  In addition, based upon finding the plethora of condoms in the house and her contracting trichomonas, the victims' mother believed that the Defendant was cheating on her.

The State then requested a bench conference.  The prosecutor noted that defense counsel had "asked a whole lot of questions about the fact that the children never told anybody[,]" though both victims had in fact made disclosures about the Defendant's molesting them when they were interviewed by the CAC in Memphis in 2003 and 2004.  The prosecutor sought permission to ask the victims' mother if "based on a separate investigation that did not involve [the victims], [she] took [them] to the [CAC] to be interviewed about whether or not [the Defendant] had ever abused them," but that the investigation was unable "to be complete[d]."  The prosecutor indicated that the victims' mother would not be able to testify about the contents of those interviews because she was not present; however, the State intended to later present the keeper of those records as a witness to testify about the details of the victims' disclosures and that the allegations were classified as "unsubstantiated."  The prosecutor remarked that an unsubstantiated classification meant that DCS's requirements for finding the abuse occurred had not been met, but that it was not a finding that the children were lying or that the abuse did not happen.  After reviewing the details from the case summary investigation report, the trial court found that the prosecutor could ask the victims' mother about why she took the

victims to the CAC within the established parameters because "right now the jury thinks that these children never told anybody that their dad was abusing them and that's not true"; defense counsel stated that he did not have any objection. The prosecutor indicated that she would later address the court about the substance of the anticipated testimony from the DCS keeper of records, once that keeper was located.

When testimony resumed, the victims' mother was asked about the events of 2003 when the victims were first interviewed by the CAC in Memphis. Specifically, the following colloquy took place:

> Q. Okay. Around that time based on an investigation that did not involve your children but an investigation of [the Defendant], did you take [the victims] to the [CAC] here in Memphis to be interviewed about possible abuse?
> A. Yes.
> . . . .
> Q. I know it was a long time ago. Just tell me what you remember about doing that, about that day when you took them and what happened when you took them. That's all.
> A. Well something was told to me so I took the kids down there just to make sure that they were okay.
> . . . .
> Q. . . . . After you took the children to be interviewed, were you aware of anything else happening with regard to your children?
> A. No.
> Q. Then after you moved to Texas.
> A. Yes.

On recross-examination, the victims' mother confirmed that after she returned to Memphis from Texas, she reestablished her relationship with the Defendant.

Both victims then testified about the sexual abuse they suffered at the hands of the Defendant. J.C.J. confirmed that they moved to the Pallwood house around 2006 or "the first part" of 2007. J.C.J. was asked to describe "anything out of the ordinary that happen[ed] . . . at the Pallwood house." J.C.J. first recalled an evening when he was playing video games in his bedroom, and the Defendant called him into the living room. According to J.C.J., he was about ten or eleven years old and in the fifth or sixth grade, and he estimated that his sister, D.B.C., was about seven or eight at the time. Once in the living room, J.C.J. saw the Defendant and D.B.C. sitting on the couch and D.B.C. only wearing a t-shirt and a pair of panties. J.C.J. also observed a pornographic film playing on the television, and the Defendant asked him to sit down and watch. After watching the film for a time, J.C.J. returned to his bedroom to play his video games.

- 10 -

Later that evening, J.C.J. was summoned again, and as he left his bedroom, he noticed a light on in D.B.C.'s room. When J.C.J. entered D.B.C.'s bedroom, he saw her unclothed lying on the bed and the Defendant standing to the right side of the bed. According to J.C.J., the Defendant requested that J.C.J. take off his clothes, which he did. There was a pornographic film playing on the television in which the actors were having intercourse, and the Defendant instructed J.C.J. to mimic the behavior with D.B.C. that he saw in the film. J.C.J. said that the Defendant walked out of the room and shut the top half of D.B.C.'s bedroom door, which was like a barn door, cut horizontally in the middle, and each section opening and closing independently. J.C.J. said that he saw the Defendant "crouched below the top half" of the door watching them while J.C.J. inserted his penis into D.B.C.'s vagina once and then said, "I don't know what I'm doing." J.C.J. left the room, and as he was exiting, noticed that the Defendant was no longer present.

Shortly thereafter, the Defendant gave J.C.J. pornographic magazines and "a pocket vagina," which was for male masturbation. According to J.C.J., the Defendant told him that at his age, he "should know how to use" the pocket vagina.

J.C.J. then described another incident where he had sexual intercourse with his sister. J.C.J. was again playing video games in his bedroom when he heard a noise in the living room. When J.C.J. went to the living room, he saw a similar scene as before—D.B.C. sitting on the couch with the Defendant and a pornographic film playing on the television. J.C.J. was once again asked to sit down and watch. According to J.C.J., the Defendant instructed that he and D.B.C. "pick out a scene" and emulate it. They picked an "oral scene," and J.C.J. put his penis into D.B.C.'s mouth.

J.C.J. described that later that evening, he heard D.B.C. giggling in the living room. J.C.J. went to the living room where he saw the Defendant and D.B.C. watching a movie. J.C.J. was then "coached" by the Defendant and put his mouth and tongue on D.B.C.'s vagina. According to J.C.J., the Defendant told him where to put his tongue "and how to wiggle it." Also, that evening, they were sitting on the couch watching a regular movie when the Defendant went to the restroom and "returned with a black movie box." The Defendant played a pornographic film depicting an "anal scene." J.C.J. was told by the Defendant "to act it out" with D.B.C., and J.C.J. inserted his penis into D.B.C.'s "butt."

J.C.J. confirmed that the family moved to Collierville around 2011. While in Collierville, the Defendant would summon J.C.J. to D.B.C.'s bedroom. According to J.C.J., though D.B.C. would appear to be sleeping, the Defendant would tell J.C.J. "to play out the same things that ha[d] happened before." J.C.J. explained that by this, he meant that he "would stick [his] penis into [D.B.C.'s] vagina and butt." On these occasions, the Defendant would be standing "right outside the door" instructing J.C.J. on what to do, how to do it, and where to put it. J.C.J. estimated that he was about twelve years old at this time.

J.C.J. testified that he wanted to tell someone about the abuse but that the Defendant would threaten him, telling him that he "would go somewhere" to have his private part "sewed up," that he would be "locked up" because he was "just as much a part of it as" the Defendant, and that he "would be removed," which J.C.J. thought meant that he would die. J.C.J. said that he believed the Defendant and was afraid. Once, while living on Pallwood, J.C.J. told the Defendant that he would tell anyways, and the Defendant "got irate and picked [him] up off [his] feet and threw [him] into a wall." J.C.J. affirmed that this hurt. On another occasion, J.C.J. also indicated that he would tell someone, and the Defendant picked him up and threw him, "except this time [J.C.J.] was held down and told that [he] was not allowed to tell." Later, while living in Collierville, J.C.J. again informed the Defendant that he was going to tell. This time, the Defendant became irate, and J.C.J. ran to his room and picked up his baseball bat. According to J.C.J., the Defendant immediately took the bat from him and threw it down the hall. J.C.J. confirmed that his mother was home at the time.

J.C.J. testified that they moved away from Memphis sometime around 2011 or 2012 and that he finally told his mother about the abuse in November 2013. J.C.J. said that he was able to then tell his mother because he knew the Defendant was in jail, which made him feel safer and less afraid. J.C.J. estimated that he was about fourteen or fifteen when he told his mother. J.C.J. confirmed that he was later interviewed by the CAC in 2013 and 2014 about the allegations. According to J.C.J., incidents like the ones he described occurred at the houses on Pallwood and in Collierville "too many [times] to count," occurring "hundreds" of times, but he could not remember the details of every single event.

On cross-examination, J.C.J. said that the Defendant told them that he had taken a picture of them while engaging in sex. In addition, J.C.J. agreed that he had been interviewed by the CAC between four to six times and that during the initial interviews, he did not disclose his sexual behavior with D.B.C. In addition, J.C.J. agreed that he had never told anyone at his school or his medical doctor about the abuse.

On redirect, J.C.J. said that the night they were told about the photograph, "it was also used against them"; however, this incident occurred in Sweetwater. J.C.J. also talked about other incidents of physical abuse besides the two times he was thrown against the wall and the one time he was held down; J.C.J. indicated that there were "a lot" of instances of being thrown, pushed, shoved, and threatened. J.C.J. also recalled that in 2003, he was interviewed by the CAC in Memphis.

D.B.C. testified that the abuse initially began at April's home, but she did not remember any specific instances other than a drawing she drew of the Defendant's penis. D.B.C. explained, "Normally everything that happened to me, I draw it."

D.B.C. testified that it was at the Pallwood house that she could vividly remember the first instances of sexual abuse by the Defendant. According to D.B.C., she was around seven years old when they moved to the Pallwood house, and the family lived there until she was in the fourth grade. She described her bedroom and her belongings and specifically mentioned that the door to her room was a "halfway door," both the top and bottom opening separately.

First, D.B.C. described an incident at the Pallwood house where the Defendant instructed her to go to her room and sit on her knees. The Defendant then came in, put a blindfold over her eyes, and said that "he was putting a dildo in [her] mouth." Though she saw a black "dildo" in his hand, D.B.C. believed that the Defendant instead stuck his penis in her mouth because "it was too warm and it was too soft." D.B.C. said that "it was familiar" given what had happened to her at April's house, though she could not recall any of those specifics. D.B.C. said that when the Defendant heard J.C.J. make a noise in the house, the Defendant stopped what he was doing "to go check on that." While the Defendant was away from the bedroom, D.B.C. heard the Defendant turn on the sink. When the Defendant returned to her room, he praised D.B.C. for doing a good job "because of how wet it was."

When asked what other kinds of things the Defendant did to her while they lived at the Pallwood house, she replied, "He was doing oral on me." She explained that the Defendant would place his mouth on her vagina after instructing her to remove her pants and underwear. D.B.C. said that this type of thing happened both in her bedroom and the Defendant's. She further testified that the Defendant also made her perform oral sex on him and that she would put his penis in her mouth. Eventually, the Defendant started having anal intercourse with D.B.C., though she could not recall for certain if this began in the Pallwood house or after in Collierville.

D.B.C. confirmed that J.C.J. was also involved in the sexual acts. She indicated that while in her bedroom, the Defendant told the nine- or ten-year-old J.C.J. to perform oral sex on her. According to D.B.C., J.C.J. first, under the Defendant's guidance, tried to engaged in vaginal intercourse with her, but when she jerked away because it was hurting her, J.C.J. stopped. She recalled that the Defendant was instructing J.C.J. the whole time he performed oral sex on her, telling J.C.J. "to lick [her] and to pull apart [her] lips." D.B.C. testified that incidents of this type that took place at the Pallwood house were too numerous to count and that they continued once they moved to Collierville.

She remembered that while living in the Pallwood house, the Defendant played pornographic films in both the Defendant's bedroom and the living room. On one occasion, the Defendant forced her to watch it with him in the living room. The Defendant said to her that he wanted her to learn how to do the acts in the film. D.B.C. recalled that

on another occasion, she and J.C.J. where in the Defendant's bedroom with the Defendant watching a pornographic film.

D.B.C. testified that the family had prayer time before bed, that the Defendant was present with her during prayer time, and that he would anally rape her during that time after they moved to the Collierville home. D.B.C. thought she was in the fifth grade when they moved to Collierville.

On one occasion at the Collierville residence, J.C.J. was performing oral sex on D.B.C. while the Defendant stood behind him watching. According to D.B.C., the Defendant instructed J.C.J. to put his tongue deeper inside her vagina. Also, on a different occasion at the Collierville home, the Defendant instructed D.B.C. to do a back bend while holding the kitchen doorframe, and she performed oral sex on him. At some point, the Defendant also performed oral sex on D.B.C.

Additionally, while living in Memphis at the Pallwood house and in Collierville, there were times when the Defendant would take D.B.C. with him on his towing trips. According to D.B.C., during these trips, the Defendant would "anally rape [her] and make [her] do oral on him in the back where the bed" was located. D.B.C. testified that the Defendant once said to her that she "wasn't old enough," but that when she got older, he would "teach [her] how to ride." She said that the Defendant abused her almost every day.

D.B.C. confirmed that when she was around eleven or twelve years old, the family moved to Sweetwater and that sometime in the summer of 2013, they moved to Alabama. D.B.C. testified that the Defendant had stopped sexually abusing her once the Defendant's relationship with the victims' mother ended. D.B.C. also confirmed that while the victims' mother was in the process of moving the family to Alabama, D.B.C. and J.C.J. went to stay with the Defendant for a month or so; D.B.C. said that she went alone first and that J.C.J. came later. Then, the children returned to Alabama and stayed with their mother.

Around that time, the Defendant purchased D.B.C. a cell phone, so they could communicate. D.B.C. affirmed that she exchanged multiple text messages with the Defendant during that time period expressing her desire to live with the Defendant. When asked about the Defendant's text messages wherein he said such things like he was "the worst thing" that had ever happened to D.B.C., that he was "a piece of s--t" for the things he had done, that he was a "destroyer of beautiful souls," and that he did not deserve to breathe, D.B.C. believed that the Defendant was referring to the sexual things that he had done to her and J.C.J.

D.B.C. did not recall ever being interviewed by the CAC in Memphis in 2003. D.B.C. recalled the evening J.C.J. first told their mother about the sexual abuse in November 2013. D.B.C. said that she wrote a note to her mother that evening, saying that

the Defendant had "been raping [her] since [they] were at April's." She remembered being interviewed multiple times by the CAC following their disclosures. D.B.C. confirmed that she did not initially disclose many of the details of the abuse in her first interviews, explaining that she had trust issues.

When asked about physical abuse, D.B.C. said that the Defendant used "a studded belt" and would hit them "from [their] back down." The Defendant showed D.B.C. the "bruises and whelps and everything that he put on" J.C.J. D.B.C. also testified that the Defendant threatened her not to tell anyone. According to D.B.C., the Defendant told her that if she told anyone about what happened, she would "go to jail and . . . be raped" and that they would kill her.

On cross-examination, D.B.C. was questioned in depth about the text messages she exchanged with the Defendant in July and August of 2013 and about what had changed by the time the family sent the letter to the Defendant in October 2013 seeking for the Defendant to terminate his parental rights. D.B.C. acknowledged that in her initial interviews with the CAC in 2013, she did not disclose that J.C.J. was also abusing her. She confirmed that during an interview, she was asked about J.C.J.'s ever being touched and that she did not mention anything "other than [his] being thrown." D.B.C. also stated that the Defendant never wore condoms while he sexually abused her, and she agreed that she had never been diagnosed with any STD.

D.B.C. was then asked about allegations of sexual abuse she made against a neighbor, Charles Brewer, in 2009. While being interviewed about those allegations, she was asked if anyone else ever touched her inappropriately in a sexual way, and she said no. Mr. Brewer pled guilty to the allegations. In addition, D.B.C. agreed that she never told anyone at her school about the abuse.

The State called Tanisha Harper, a DCS investigator for eleven years, who testified that she had reviewed "some records involving an allegation" against the Defendant back in 2002 or 2003 and confirmed that three-year-old D.B.C. and five-year-old J.C.J. were forensically interviewed during the investigation of that allegation. Ms. Harper was asked to read from the records, and the Defendant lodged no objection. Ms. Harper, reading from the records, informed that D.B.C. reported that "Jerry told her to lick his weeny," but that she said "she didn't bite it." As for J.C.J., he reported that the Defendant would have sex with D.B.C.; that when he walked into a room, the Defendant was rubbing D.B.C.'s bottom with a belt; that D.B.C. "told him that Jerry put his winky in her mouth"; and that the Defendant put "his winky on his back." Ms. Harper continued testifying that J.C.J. said that the Defendant would punch him the face, that he actually saw the Defendant pull down D.B.C.'s pants and "put his winky into [D.B.C.'s] mouth," and that someone named "Mike" would have sex with D.B.C. and put "his winky" in her mouth. Ms. Harper elaborated that the children's allegations were labeled as Allegation Unfounded Perpetrator

- 15 -

Unfounded ("AUPU"), explaining that label was given when there was "no solid evidence" because the child could not provide specific details to support the case, though it could be because the child was too young to give specific evidence, and it did not mean the abuse did not happen.

On cross-examination, Ms. Harper referenced another page of the case summary, wherein it was stated that the sexually acting out behavior between the two children had stopped since they received counseling, that the victims' mother was taking parenting classes, that there were no findings of abuse in the medical examinations, and that there was no disclosure by either child. Ms. Harper confirmed that after both a medical exam and specialized forensic interview, there was no medical or forensic evidence of sexual assault. Ms. Harper was then asked about another page from the case summary, wherein it noted similar information that the children had been to three counseling sessions, that the victims' mother reported that the sexually acting out behavior between the children had tremendously decreased, that the victims' mother had set better expectations concerning supervision, and that the children were no longer allowed to bathe together.

The State then requested a bench conference. The State indicated that it was "happy to give [defense counsel] some leeway . . . , but the purpose of entering these records [was] specifically to rebut the argument that the children never told anybody, not to go into the entire substance of this DCS investigation." The State also further noted that the substantive allegation regarding the Defendant's actions with a twelve-year-old neighbor led to the DCS investigation into the children's behavior and culminated in the Defendant's 2003 convictions for statutory rape and sexual battery. As noted in the case summary, the victims' mother reported that the Defendant had oral sex with the twelve-year-old girl in the presence of D.B.C. and J.C.J.; that D.B.C. and J.C.J. had been acting out sexually, including touching each other's private parts; and that J.C.J. had been seen by a doctor for having a bite mark on his penis. It was also noted that the victims' mother had an order of protection against the Defendant.

Defense counsel argued that the State had "opened the door" to delving into further specifics of the forensic interviews when it asked questions regarding the children's statements made therein, that there was information in the case summary that specifically rebutted portions of what the State had Ms. Harper read into evidence, and that the defense had a fundamental right of fairness to rebut the information through cross-examination. The trial court indicated that those facts had been sufficiently rebutted by the fact that Ms. Harper stated the investigation into the children's allegations was unfounded. The State responded that if the defense intended to "talk about the bad things about this case," then it should be allowed "to talk about the reason this case existed in the first place."

Defense counsel asserted that the specifics of the prior disclosures were important because they showed the reason why the children were interviewed in 2003, that being

"because [D.B.C.] bit [J.C.J.] on the penis," which "had nothing to do with [the Defendant]." The trial court, however, noted that defense counsel was "just reading half of it," to which the State submitted that if defense counsel chose to read that half of the record, then it should be allowed to read the other half. The trial court advised defense counsel that he was going down a "dangerous" path. Defense counsel said that he did not think "that" was relevant and had to be excluded. The trial court then excused the jury, and further discussion ensued.

The trial court first observed that it had not been previously provided with a copy of the case summary investigation report. The trial court reviewed the sequence of events as relayed in the report regarding why the victims' mother brought the children to the CAC in 2003 to be interviewed and concluded,

> [I]t was a logical chronology here . . . that the statutory rape and the sexual battery came first. There's a void in this thing. How do you explain to the jury why they brought the children there without lying to them, without telling them the truth of the whole story?
>
> The whole story is that they were brought there because [of] sexual activity with other people [for] which he was convicted. That was the reason why she brought the children there.

The trial court observed that the reason why the State was allowed to read in the previous portions was "because it was alleged they never told anyone before. And that's just not true. They did tell someone before. They told the people at the CAC. So that made that relevant." The trial court also noted that the jury received information that the allegations were unfounded and were provided with an explanation that the "children were so young, they were bouncing all over the place." In addition, the trial court remarked that the information was not offered by the State for the truth of the matter asserted but to establish that the children had told someone before about the abuse.

Defense counsel said that the defense had a right to rebut the State's evidence with information about "where the investigation began," that being that "there was a dispatch to the listed locations of a possible child abuse from a LeBonheur social worker of the complaint the four-year-old son was at the hospital with a bite mark on his penis inflicted by the two-and-a-half-year-old sister," that D.B.C. said that she did not bite her brother, and that there was some question about whether D.B.C. was referring to the Defendant or her brother. Defense counsel asserted that he should be able to challenge "the weight of that information" with further specific details from the report. The State replied that "to say that the only reason the children came in was because of this bite mark [was] also not accurate." Defense counsel indicated that he would refer to it as "some other case not

related to this one, that's why [they] went to the CAC," as they had done similarly already several times during the trial.

The trial court noted that the report also included pertinent information that the children had seen then the Defendant engaged in this behavior with the twelve-year-old girl, which was their reason for acting out sexually. The trial court informed defense counsel that "obviously you have a right to cross-examine," but it warned him that "it's a dangerous place to go" because it would omit the "whole story" and be misleading to the jury. Defense counsel averred that he had "basic fundamental right" to rebut the State's evidence without the State putting on evidence of the Defendant's 2003 convictions.

Subsequently, defense counsel was asked to provide specifics of his requested testimony. The following colloquy then took place:

> [DEFENSE COUNSEL]: . . . I want to elicit the fact that [J.C.J.] who I guess at this point must be four went to a hospital for a bite mark on his penis that was inflicted by the two-and-a-half-year-old sister [D.B.C.]
>
> . . . . [T]here's her statement and his statement. Her statement is that Jerry told her to lick his winky but didn't go into details. She says I didn't bite it though. Why would she be saying bite it though? Why would she make that distinction unless she had been accused of biting it? She was accused of biting it. She's the one that bit it.
>
> THE COURT: That's it?
>
> [DEFENSE COUNSEL]: . . . [F]urther in the same paragraph it says that the younger Jerry saw a different Jerry put his winky her mouth.
>
> THE COURT: That's already been read into the record.
>
> . . . .
>
> [DEFENSE COUNSEL]: And I should be able to ask questions about that without somehow opening this door that he's this convicted sex offender because the State elicited it and I can ask about the incredible nature of the statements or how it was put together, what he said. I don't have anything else externally that I get to ask. I get to read it and ask questions about it, make sure it's fully made for the record.

The trial court later stated that the "problem" here, though, was that the report also provided information about how the children learned this behavior, which was "the whole

truth." Defense counsel replied, "Yes. We don't always rely on the truth. We rely upon fundamental fairness, due process and rules of evidence."

The State then inquired that if defense counsel went "down that road," would it be allowed to ask Ms. Harper about DCS policy:

> that a child who is found to be committing a sex act against another child is then classified by DCS as a victim and an investigation ensues to look and see who has taught that child the behavior. Whether it's pornography or someone abusing them or whatever. But the point is that [D.B.C.] in this case even if she's the one that bit [J.C.J.'s] penis is then classified by DCS as a victim and an investigation of her case would start at that point.

The State continued that this testimony from Ms. Harper would "actually give[] credit" to the information in the report that the children saw the Defendant with the twelve-year-old girl. The trial court agreed that if the defense chose to pursue that line of questioning, then the State could establish that DCS protocol generally would be to engage in an investigation to find out why a child might be acting out.

Ultimately, the trial court concluded that the State was prohibited from "get[ting] into the fact there's an allegation" involving this twelve-year-old girl and to "stay away from the prior convictions" and "away from having sex with other people, that they learned it from their father." However, the court further determined that the State would be allowed to ask Ms. Harper if the children had advised that they learned this behavior from the Defendant and about DCS policy as to how they would classify the victims and the assumption that it was a learned behavior. At this juncture, defense counsel lodged an objection. However, the trial court opined that it was "still a fair assessment of the facts that [were] alleged in this document rather than read[ing] the whole thing" and "mak[ing] the record a little bit cleaner" by avoiding evidence of the Defendant's prior convictions and to "[s]tay away from [the Defendant's] having sex with other people." The trial court stated that after reading the report, defense counsel was "right" that it was "fair to go into the fact that" D.B.C. may have been describing what her brother was doing to her instead of the Defendant. The trial court also stated that leading questions would be permitted to avoid the entry of inadmissible evidence. The trial court noted that it would have liked to have seen the case summary investigation report sooner in order to better understand the issues and that it likely would not have argued as much with defense counsel if it had.

Cross-examination of Ms. Harper resumed. Ms. Harper confirmed that D.B.C. "was unable to give a statement because she was all over the place" and that there was confusion about whether D.B.C. was referring to the Defendant or brother. In addition, Ms. Harper agreed that J.C.J. was asked if the events really happened or if someone told him to say it happened and that J.C.J. replied that the Defendant told him to tell them it happened. Ms.

Harper further agreed that J.C.J. said Mike was having sex with D.B.C. and that mom kicked Mike out of the house. Ms. Harper indicated that the DCS investigation did not end there, but acknowledged that there was never any prosecution based upon the children's allegations and that the investigation ended with findings of "perpetrator unfounded" and "allegations unfounded."

After Ms. Harper was excused and the jury left the courtroom, the trial court asked defense counsel, "I see . . . you decided to stay away from that?" Defense counsel responded, "I had to, Judge. I didn't see any way around the ruling that would allow my client to have a fair trial." The trial court remarked, "Well we have different perspectives I suppose." The DCS report was marked for identification purposes.

Karon Sullivan testified that she worked at a CAC in Alabama and that she had been a forensic interviewer since 2007. She confirmed that beginning in late 2013 through 2014, she had conducted forensic interviews with J.C.J. and D.B.C. involving these allegations. She relayed the details of the five interviews she had with J.C.J. and the seven interviews she had with D.B.C. According to Ms. Sullivan, the initial interviews were often spent building a rapport with the children. She did not find surprising that the victims took several interviews before they were willing to tell her about the alleged abuse they suffered at the hands of the Defendant. Based upon her training, Ms. Sullivan noticed several factors that weighed in favor of the victims' credibility regarding their disclosures. On cross-examination, Ms. Sullivan confirmed that in her report, it was not noted that D.B.C. never mentioned a back bend or a blindfold.

The State rested, and the defense called April Vaughn to testify. Ms. Vaughn recalled that the Carter family moved into her home in 2007 shortly after the birth of her son. She specifically remembered having to adjust to living life with a newborn during this time, having to feed the child every two hours, and having to stay mostly between the living room and kitchen. Ms. Vaughn testified that her husband and the Defendant both worked during the day, although the Defendant would also work at night sometimes and be gone for longer periods when driving his tow truck on "long hauls." On the other hand, the victims' mother and Ms. Vaughn were both home all day with Ms. Vaughn's son until J.C.J. and D.B.C. got home from school. Ms. Vaughn stated that she never saw anything that made her believe the children were being sexually abused.

According to Ms. Vaughn, the Carter family stayed with her maybe six months or less before they moved into their new home on Pallwood. Ms. Vaughn said that she was familiar with the interior of the Pallwood house because she would visit the Carters to play a video game called Guitar Hero and because her mother moved into the Pallwood house after the Carters moved out. Ms. Vaughn testified that D.B.C.'s bedroom door at the Pallwood house was "a single solid core door" and not a split door.

Steven Carter, the Defendant's first cousin, testified that he stayed with the Carters at the Pallwood residence about three or four days a week for about a year in 2007 to 2008. He stated that he never saw any behavior that led him to believe the children were being physically or sexually abused. He opined that D.B.C. was considered a "daddy's girl" and was favored by the Defendant. He also testified that the victims' mother was a "homebody" and did not leave the house often.

The State dismissed Count 8 because the victims testified that the events underlying that count occurred in Sweetwater, which was in a different county.[5] The remaining ten counts, which were not renumbered, were submitted to the jury. The jury found the Defendant guilty as charged on all ten counts.

C. Post-Trial. A sentencing hearing took place on January 29, 2020. The court found that three enhancement factors and no mitigating factors were applicable, and it imposed sentences of forty years for Counts 1 through 3, six years for Counts 4 through 6, eleven months and twenty-nine days for Count 7, twelve years for Counts 9 and 10,[6] and six years for Count 11. After finding that the Defendant had an extensive criminal record and that he had been convicted of two or more statutory offenses involving sexual abuse of a minor and noting the aggravating circumstances, the trial court ordered each sentence to run consecutively for an effective sentence of 168 years, 11 months, and 29 days.

Following the denial of the Defendant's timely-filed motion for new trial, he filed a timely notice of appeal. The case is now before us for our review.

ANALYSIS

On appeal, the Defendant argues that (1) the trial court erred when it ruled that the Defendant's prior convictions for statutory rape and sexual battery were relevant and admissible; (2) the trial court's rulings regarding the defense's ability to cross-examine witnesses impermissibly restricted the Defendant's right to put on a defense; (3) the trial court erred when it characterized the text messages between the Defendant and D.B.C. as a confession or admission against interest and gave the jury the corresponding instruction; and (4) the cumulative effect of the errors entitle him to a new trial. The State responds that the Defendant's claims do not entitle him to relief. We will address each in turn.

---

[5] From context, it appears that Count 8 involved the events surrounding the photograph. Though Count 8 was dismissed, no judgment form was entered reflecting such.

[6] At the sentencing hearing, the court indicated it was imposing twelve-year sentences for Counts 9 and 10, but the judgment forms indicate eight-year sentences.

## I. Admissibility of Prior Convictions

The Defendant argues that the trial court committed reversible error when it ruled that the Defendant's 2003 prior convictions for statutory rape and sexual battery involving an underage victim were relevant and admissible, noting that this trial involved similar allegations of sexual abuse by child victims. Specifically, the Defendant submits that the trial court abused its discretion by ruling that the Defendant's prior convictions were admissible even though their prejudicial effect outweighed the probative value, contending that the trial court seemed to misunderstand the Rule 404(b) standard.

Though the Defendant goes to great lengths in his argument regarding this issue, we agree with the State's pertinent observation that "the challenged conviction was never introduced at trial, in which case any alleged error was certainly harmless." Regardless of the propriety of any ruling, the convictions were never admitted into evidence. The allegations were only referred to obliquely, using the precise remedy the Defendant fashioned. The Defendant is not entitled to relief.

## II. Opening the Door

The crux of the Defendant's argument regarding the admissibility of the 2003 convictions lies with the trial court's ruling regarding the cross-examination of witnesses and that if the defense delved into certain areas, then the convictions would become admissible. First, according to the Defendant, the trial court incorrectly ruled that if the defense cross-examined the victims' mother regarding payments she allegedly made to a father of a child to accuse the Defendant of sexual abuse, then the convictions were admissible. The Defendant intended to argue that the victims' mother paid the father to make the allegations in order to have the Defendant's parental rights terminated and that when those allegations were discovered to be false, the victims' mother encouraged her children to fabricate the present allegations. The Defendant observes that these separate allegations regarding the fabricated abuse had nothing to do with why the children were taken for the forensic interviews in 2003 and admission of the 2003 convictions was not needed to "complete the story."

Second, the Defendant refers to the trial court's ruling regarding the cross-examination of Ms. Harper that any cross-examination of Ms. Harper regarding further specifics of the case summary investigation report would open the door to testimony from Ms. Harper that the children learned the behavior from the Defendant. The Defendant submits that the trial court, through this ruling, imposed was an improper restriction on the Defendant's fundamental right to present a defense and cross-examine witnesses. The Defendant acknowledges that the evidence solicited by the State during its direct examination of Ms. Harper was admissible to rebut the defense's proof that the victims had never disclosed the abuse to anyone.

The Defendant submits, however, that he should have been allowed to establish through Ms. Harper's cross-examination that the victims were taken to be forensically interviewed because they had been acting out sexual behavior and that D.B.C. bit J.C.J.'s penis during one of those acts. The Defendant contends that without this information, the jury was "left with an incredible story of the adults in charge failing" the victims. The Defendant contends that the State could have established, in response to its additional questioning of Ms. Harper, that the children were taken to the CAC "for some other case not related to this one" and that admission of the 2003 convictions was unnecessary. The Defendant further faults the trial court's ruling that if the defense went into specifics of the allegations, then the State would be allowed to elicit testimony from Ms. Harper that the children learned the abuse from the Defendant. The Defendant surmises that "[t]he defense was left without recourse because an explanation could not be offered for why the children's testimony was determined to be unfounded without allowing [the Defendant's] conviction to be admitted albeit tangentially."

The State first notes that the Defendant was not prevented from cross-examining either witness, but rather, the trial court provided proactive warnings. Then, the State submits that the mere fact that the Defendant strategically chose not to ask questions after being proactively warned of the consequences by the trial court does not amount to the denial of his right to present a defense. Relative to the potential questioning of the victims' mother about an alleged payment made in exchange for fabricating a claim, the States maintains that the trial court merely informed the Defendant that such questioning would affect the balancing test on whether the Defendant's prior convictions were admissible. Likewise, relative to Ms. Harper's cross-examination regarding the Defendant's inquiry into the specific disclosures made by the victims during the 2003 interview, the trial court explicitly stated that "obviously you have a right to cross-examine" and again only warned that such questioning would open the door for the State to present further evidence. The State surmises that the Defendant was never stopped from cross-examining a witness and notes that the Defendant has failed to cite any authority establishing that being forewarned of potential consequences, and reacting accordingly, rises to the level of a constitutional violation. We agree with the State that the Defendant was not precluded from cross-examining the witnesses and that the mere fact the defense strategically chose not to ask questions after being proactively warned about the consequences by the trial court does not amount to the denial of his right to present a defense.

Evidence that is not admissible may be admitted if the defendant "opens the door" by putting the issue into controversy. State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012) (concluding that, "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence"). A party commonly opens the door "by raising the subject of that evidence at trial." Id. Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may

- 23 -

be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1 (2d ed. 1987)). Our supreme court has recently emphasized this doctrine. State v. Vance, 596 S.W.3d 229, 250 (Tenn. 2020.)

Although raising a subject at trial is one manner of opening the door to otherwise inadmissible evidence, the concept of "opening the door" is "notoriously imprecise." Gomez, 367 S.W.3d at 246 (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039)). In addition,

> [a]lthough the doctrine arises from the common law tradition of evidence, cf. Roger C. Park et al., Evidence Law § 1.11 (3d ed. 2011) (describing "curative admissibility" as a common law doctrine), our Rules of Evidence contain numerous examples by which otherwise inadmissible evidence may become admissible as a result of the action of a party in the case.

Id. For example, if evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. Id. (citing Tenn. R. Evid. 404(a)(1), (2); see also Tenn. R. Evid. 405(a)). A party may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. Id. (citing Tenn. R. Evid. 608(a)). In short, "opening the door" is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence. Id.

Relative to the victims' mother, the Defendant sought to introduce evidence that the victims' mother paid the Arkansas victim's father to make false allegations of sexual abuse against the Defendant in an effort to have the Defendant's parental rights terminated. Apparently, the Defendant sought to cross-examine the victims' mother about this information, as well as presenting another witness, inferentially the Arkansas victim's father, to testify to such. This evidence would have placed at issue whether other sufficient information existed that would effectuate termination of the Defendant's parental rights and whether the victims' mother engaged in a pattern of false allegations against the Defendant solely for the purpose of terminating the Defendant's parental rights. Accordingly, the door would have been opened for the State to present evidence of the Defendant's 2003 convictions in order to dispel the defense's suggestion that no other evidence existed sufficient for termination of the Defendant's parental rights and that the victims' mother consistently made false allegations, including getting her children to make the present claims of sexual abuse, solely in an effort to have the Defendant's parental rights terminated.

Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. However, Rule 404(b) also provides that evidence of other bad acts may be admissible for other purposes, such as "'to show identity,

guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" State v. Moore, 6 S.W.3d 235, 239 n.5 (Tenn. 1999) (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)). Extraneous offense evidence may be admissible for other purposes besides character conformity. Rebuttal of a defensive theory is one of these "other purposes." In addition, before a trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Here, the trial court did not allow the evidence for propensity purposes but to rebut any allegations of recent fabrication. See, e.g., United States v. Finch, 78 M.J. 781, 790-92 (A. Ct. Crim. App. 2019) (holding that the defense's cross-examination of the victim opened the door, in a prosecution for one specification of violating a lawful general regulation, one specification of sexual abuse of a child, and three specifications of rape of a child under the age of twelve, for the Government to introduce prior consistent statements to rebut the charge of recent fabrication); Banks v. State, 494 S.W.3d 883, 892-93 (Tex. Ct. App. 2016) (determining that the trial court did not abuse its discretion in finding that the defendant opened door to evidence of a prior conviction for sexual abuse in order to rebut the defendant's theory that the child had fabricated the accusation). The trial court also complied with the procedural requirements of rule 404(b).

Relative to Ms. Harper, though the trial court's ruling evolved over time, the trial court ultimately concluded that the defense could ask Ms. Harper on cross-examination that the victims were taken to be forensically interviewed because they had been acting out sexual behavior and that D.B.C. bit J.C.J.'s penis during one of those acts. The trial court stated that after reading the report, defense counsel was "right" that it was "fair to go into the fact that" D.B.C. may have been describing what her brother was doing to her instead of the Defendant. Moreover, the trial court determined that the State was prohibited from "get[ting] into the fact there's an allegation" from 2003 involving this twelve-year-old girl and to "stay away from the prior convictions" and "from [the Defendant's] having sex with

other people." Thus, despite the Defendant's assertion to the contrary, the Defendant was granted permission to engage in the cross-examination of Ms. Harper he sought.

The Defendant complains that the trial court erred when it concluded that the State would be allowed to ask Ms. Harper if the children had advised her that they learned this behavior from the Defendant, as well as about DCS policy on classification of the victims and the assumption that it was a learned behavior under these circumstances. Ms. Harper was a DCS investigator for eleven years, and she testified about the DCS investigation process. The Defendant indicated that he sought to introduce information that the reason the children were interviewed was because of the bite mark on J.C.J.'s penis, which would have left an incomplete picture for the jury, as this was not the only reason they were interviewed. The trial court allowed the State to ask a question that was as minimally intrusive as possible by not referencing the 2003 convictions nor the Defendant's sexual activity with others, only asking if the victims advised that they learned this behavior from the Defendant and about DCS policy. This was allowed in order to provide a complete picture, as much as possible, of why these children were interviewed and the nature of their disclosures without getting into more prejudicial information. We cannot say that the trial court abused its discretion in finding that the defense would have opened the door to this line of questioning of Ms. Harper. See Williams v. State, 991 So.2d 593, 607 (Miss. 2008) (holding that 404(b) evidence was essential to provide the jury with a "complete story" of the events that led to the defendant's being identified as the person who perpetrated the crimes charged); Turner v. State, 4 S.W.3d 74, 79-80 (Tex. Ct. App. 1999) (determining that once the defendant opened the door to collateral issues, the prosecution was entitled to introduce evidence to complete the story).

Defense counsel made the strategic decision to forego questioning these witnesses on the particular topics in order to avoid "opening the door" to more damaging evidence. Such a strategic decision does not violate a defendant's constitutional rights to a defense or to cross-examine that State's witnesses. See Bailey v. Pitcher, 86 Fed. Appx. 110, 114 (6th Cir. 2004) (holding the same with respect to a defendant's right to cross-examine witnesses under the Confrontation Clause).

### III. Admission Against Interest

Next, the Defendant argues that the trial court committed reversible error when it characterized the text messages between the Defendant and D.B.C. as a confession or admission against interest and gave the jury the corresponding instruction. According to the Defendant, nowhere in the text messages is there any statement by the Defendant nor in the responses given by D.B.C. that amounts to an acknowledgement of sexual abuse. The Defendant remarks, "There is no specific reference to it, no allusion to the sexual abuse of either [victim], no asking for forgiveness, or a reaction by [D.B.C.] that would suggest that sexual abuse was the topic at hand." The Defendant asserts that the opposite is, in fact,

true because D.B.C. tries to reassure the Defendant that he has done nothing wrong. The Defendant asserts that the text messages reflect the Defendant's disappointment with how the separation with the victims' mother was affecting D.B.C.

The State responds that the text messages could easily be interpreted as the Defendant's referencing his sexual abuse of the victims, and thus, the trial court properly included the instruction. According to the State, "the [D]efendant may view his messages as being innocent, but the jury was entitled to interpret them differently." In addition, the State concludes that any error in this regard was harmless given the overwhelming evidence against the Defendant.

When discussing the jury charge, defense counsel objected to any instruction on a confession, opining that there had been no confession or admission against interest. The trial court said that the "text messages sure sound[ed] like admitting to something" and that it was up to the jury to decide the meaning. The trial court continued,

> It doesn't amount to a full confession like I admit that I did all these sexual acts to you and I'm sorry. But it does sort of allude to the fact that the language there is in my opinion the jury could take it either as confessing that he's sorry for all the things he did or they just could take it any other way they want. But the wording of it is pretty explicit so I think it either amounts to what could be argued as a confession or at the very least an admission against interest.

In the final jury charge, the trial court gave the following instruction:

> Evidence has been introduced in the trial of a statement or statements made by the [Defendant] outside the trial to show a confession or admission against interest. A confession is a statement by the [D]efendant that . . . he committed the crime charged. An admission against interest is a statement by the [D]efendant which acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of a defendant or is evidence of some material fact but does not amount to a confession.

> While this evidence has been received, it remains your duty to decide if, in fact, such statement was ever made. If you believe a statement was not made by the [D]efendant, you should not consider it. If you decide the statement was made by the [D]efendant, you must judge the truth of the facts stated. In so determining, consider the circumstances under which the statement was made. Also, consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not,

- 27 -

however, arbitrarily disregard any part of any statement, but rather should consider all of any statement you believe was made and is true. You are the sole judge of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining the [D]efendant's guilt or innocence.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.11 (2019 ed.)

Our supreme court has noted that "[t]he distinction between an admission and a confession is blurred." Helton v. State, 547 S.W.2d 564, 567 (Tenn. 1977), overruled on other grounds by State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). Generally, when a defendant admits in a statement to having engaged in each element of the crime with which he or she is charged, the statement is properly characterized as a confession. See State v. Lee, 631 S.W.2d 453, 455 (Tenn. Crim. App. 1982). On the other hand, an admission is an acknowledgment by the accused of certain facts that tend, along with other facts, to establish guilt. Helton, 547 S.W.2d at 567. "An admission, then, is something less than a confession and, unlike a confession, . . . an admission is not sufficient in itself to support a conviction." Id.

In the text messages, the Defendant told D.B.C. the following:

I am the worst thing that has ever happened to you[.] I really don't feel worthy of anyone[']s love[.] I absolutely hate the things I have done and the ways that I have hurt people[.] I am a piece of s--t who doesn't even deserve to breathe[.] I don't wanna talk to anyone[.] I just want to stop existing! My only wish is that you could erase every memory of me.

Subsequently, the victim said to the Defendant "[N]o one cares about the past[,] it[']s the future they care about[,]" and the Defendant responded, "I don't deserve your love or your words. [Yo]ur life would b[e] destroyed if [yo]u allowed me back into it! I believe an eternity of hell is no match for a heartache of hurting those you love and leaving those you love[.] I am a destroyer of beautiful souls." At trial, D.B.C. was asked about the substance of these text messages, and she affirmed that she believed that the Defendant was referring to the sexual things he had done to her and J.C.J.

The jury was free to credit D.B.C.'s interpretation of the Defendant's text messages. These statements, taken together with other facts, tend to establish the Defendant's guilt of the crimes charged, and therefore, can be construed as an admission against interest. See generally State v. Antonio George White, No. 775, 1987 WL 25166, at *1 (Tenn. Crim. App. Dec. 1, 1987) (stating that the defendant's statement denying involvement in the crime, but admitting being at the crime scene with another perpetrator, was an admission under Helton); see also State v. Litton, 161 S.W.3d 447, 458-59 (Tenn. Crim. App. 2004).

- 28 -

We conclude that the trial court properly gave the instruction on an admission against interest. It allowed the jury to consider the surrounding circumstances and determine, in proper context, if the Defendant was acknowledging culpability.

However, whether these text messages qualify as a confession is certainly somewhat more problematic because the statements are not acknowledgments by the Defendant to having engaged in elements of the crimes charged. Nonetheless, the trial court correctly charged the difference between an admission and a confession. The trial court did not attempt to determine or define for the jury which statement, if either, existed in this case. The trial court also informed the jury that it was the jury's province to determine what weight, if any, the statements proven in the case should carry. The court additionally informed the jury that it might take any statement in consideration with all the other facts and circumstances proven in the case. This, together with the overwhelming proof of the Defendant's guilt, convinces us that any error in giving the instruction on confessions was, at worst, harmless. See, e.g., Sate v. Milton Lee Cooper, No. 03C01-9706-CR-00202, 1998 WL 573409, at *6-7 (Tenn. Crim. App. Sept. 9, 1998) (reaching a similar conclusion).

### IV. Cumulative Error

The Defendant contends that even if each of the above-referenced errors do not entitle him to a new trial standing alone, the cumulative effect of the errors deprived him of a fair trial. The State argues that because no errors occurred, the cumulative error doctrine is inapplicable.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Because we have found only one potential error in this case, which we have deemed harmless, the cumulative error doctrine is inapplicable.

### V. Judgment Forms

As a final note, we recognize some issues with the judgment forms in this case that need to be corrected. Count 8 was dismissed prior to the jury charge. However, no judgment form was entered for that count reflecting its dismissal. See Tenn. R. Crim. P. 32(e)(3) ("If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall enter judgment accordingly."); State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order) ("For charges resulting in a not guilty verdict or a dismissal, the

trial court should 'enter judgment accordingly' as to the respective count."). Moreover, as noted above, the judgment forms in Counts 9 and 10 reflect eight-year sentences when the trial court, in fact, imposed twelve-year sentences. Upon remand, a judgment form shall be entered in Count 8, and the sentence length in Counts 9 and 10 shall be corrected.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. However, the case is remanded for entry of corrected judgment forms consistent with this opinion.

_____

D. KELLY THOMAS, JR., JUDGE